[No. S029384. Feb. 25, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY RAY HILLHOUSE, Defendant and Appellant.

474

**COUNSEL**

Andrew Parnes and E. Evans Young, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Eric L. Christoffersen, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—A jury convicted defendant of the first degree murder (Pen. Code, § 187),[1] robbery (§ 211), and kidnapping for robbery (§ 209, subd. (b)) of Brett Schultz and found true special circumstance allegations of lying in wait (§ 190.2, subd. (a)(15)), robbery murder (§ 190.2, subd. (a)(17)), and kidnapping murder (§ 190.2, subd. (a)(17)). The jury also found that defendant personally used a deadly weapon, a knife, as to all counts. (§ 12022, subd. (b).) After a penalty trial, the jury returned a verdict of death, and the court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).)

We reverse the kidnapping for robbery conviction and kidnapping-murder special circumstance and otherwise affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

The evidence showed that sometime during the night of March 8 or the morning of March 9, 1991, defendant and his brother, Lonnie Hillhouse, drove the victim, Brett Schultz, to a location in the Chico area, where, according to Lonnie, defendant stabbed him to death. Defendant and Lonnie took the victim's truck and other property. Lonnie was originally a codefendant in this case, but he pleaded guilty to second degree murder and testified at trial.

##### a. *Lonnie Hillhouse's Testimony*

Lonnie testified that on the evening of the crime, he and defendant went to the Madison Bear Garden, a bar in Chico. There they met the victim, Schultz, who purchased the three men a pitcher of beer, paying for it with a $100 bill. They also met Janice Murphy, who joined the group. Eventually, the group decided to leave the bar. Lonnie heard Schultz ask defendant to drive and saw him hand him some keys. The four left and entered Schultz's pickup truck. Defendant drove. Soon defendant started to drive the wrong way on a one-way street. Upset about this, Lonnie got out of the truck and walked to his apartment, leaving the other three behind. Christine Hoover and Debbie Dodge were in the apartment.

Later that night, Lonnie saw defendant and Schultz sitting in the same truck outside his apartment. Shortly after that, defendant came to speak with

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Lonnie in the apartment. Defendant asked Lonnie if he "wanted to be with the big boys," to which he responded yes. Defendant said, "[T]his guy's got some money out here and I am going to kill him and take it." He asked Lonnie to go with him. When Lonnie said no, defendant looked at him and said, "I told you what I am going to do, and if you say anything to anybody, the same thing is going to happen to you." They then left in Schultz's truck, with defendant driving in the direction of Paradise. Schultz was sitting between Lonnie and defendant. Schultz was "passed out," apparently drunk. It was around midnight.

As they were driving, defendant asked Lonnie to "check his pockets." In response, Lonnie took some money—about "three or four bills wadded up"—from Schultz's pocket and gave it to defendant. The three stopped at a gas station in Paradise, where they purchased gasoline. When Lonnie paid for the gasoline, he wanted to tell the clerk to call the police, but he was afraid to do so. Then they continued driving. Schultz's condition was unchanged. At some point, Schultz "started coming to, and asked where we were going." Defendant told him they were going to his "wife's house to get some pot, and we would be back to Chico by morning or before work." (Defendant was unmarried.) As they kept driving, Schultz seemed to become more concerned about where they were going, and he asked defendant to turn the truck around. Defendant turned around and drove in the opposition direction. Schultz then asked to "pull over," so they stopped.

The three got out of the car. Schultz started urinating. Defendant walked around the back of the truck and approached Schultz. Lonnie testified, "[Defendant] said something that I didn't catch and [Schultz] said, 'Don't fuck with me while I'm peeing,' and [defendant] said, 'I ought to kill you.' And I heard a thunk and [Schultz] started gasping for air and I turned away." Lonnie observed Schultz "leaning against the door [of the truck] trying to keep from falling with his hands on his chest." Defendant "grabbed him and threw him to the ground." Lonnie seized Schultz by the arm and rolled him over. He observed blood on Schultz's chest and on defendant's hand. Defendant "said, 'Why let him suffer,' and stuck [i.e., stabbed] him a couple more times." Lonnie heard Schultz again gasping for air.

Defendant asked Lonnie to help drag Schultz's body behind some trees. The two dragged the body until defendant said "this is good." Defendant then repositioned the truck so its headlights illuminated the body, and they moved the body a "foot or so" further up a hill. During the dragging, the body made no more sounds and did not move on its own. At defendant's request, Lonnie checked one of the body's pockets; defendant checked others. Lonnie did not remove anything and did not see defendant remove

anything. The two drove back towards Paradise. On the way they stopped at a gas station—a different one than before—to wash their hands of blood. Defendant then drove to some friends' house. Defendant entered the house but returned to Lonnie in the truck about 10 or 15 minutes later. Defendant said they would have to return later in the morning "because he was told that he had a wife and kids and that he didn't want to be bothered or something . . . ."

The two brothers commenced driving again, now towards Chico. On the way, defendant asked Lonnie to throw a knife out of the truck. In response, Lonnie took a knife from the seat where defendant had placed it and threw it from the car. Eventually the two drove to a friend's apartment in Chico. They parked the truck a couple of blocks away and, at defendant's direction, wiped fingerprints from it. They then went to sleep.

A couple of days later, defendant and defendant's acquaintance, Gary Reep, went with Lonnie to a pawnshop where, at defendant's and Reep's direction, Lonnie pawned some tools that defendant said belonged to Reep. They told Lonnie to pawn them because he was the only one of the trio who had identification. He received $80 for the tools, which he gave to defendant with the pawn tickets.

Lonnie was present when the police arrested defendant. Defendant said to him at the time, "Remember, Lonnie." Lonnie considered the statement a threat.

Lonnie admitted that he lied to the police and prosecution at first to protect himself and his brother, but he said he was telling the truth at trial.

b. *Other Evidence*

Schultz's body was found in the Sterling City area. The physical evidence indicated it had been dragged to its final location. It appeared the body had been placed where it would be difficult to see from the road. Schultz died of multiple stab wounds, including four in his chest.

Debbie Dodge testified she shared an apartment with the Hillhouse brothers for about a week around the time of the killing. Based on her observations of their interactions, she believed "Lonnie was really afraid of [defendant]." Defendant was the more dominant of the two. He was "more controlling." Lonnie "would jump whenever [defendant] spoke, he'd jump, do whatever he wanted."

Schultz's employer testified that he had given Schultz five $100 bills in payment shortly before his death. After he died, four $100 bills were found

in his bedroom. Janice Murphy testified that she was with the Hillhouse brothers and Schultz at the Madison Bear Garden the evening of the killing. When the group left to go elsewhere, defendant drove Schultz's truck. On the way, Lonnie became frustrated with defendant's driving and left on foot. Eventually, Murphy went with defendant and Schultz to go home. Schultz was quite intoxicated. Defendant had been drinking, but she "didn't see anything really wrong" with him. She drove Schultz's truck, but when she arrived at her home, she gave the keys to defendant. Schultz was "passed out" on the passenger side of the truck.

Around 4:30 on the morning of the killing, defendant visited the home of Teresa and Keith Schulz (no relation to the victim, Schultz), located about two miles from the road near which the body was found, and asked to speak with Keith. Teresa saw that defendant was driving a truck like the one that belonged to Schultz, but she could not tell if anyone else was in it. Defendant asked Keith for some money to get gasoline. Keith told him he was a "family man" and asked him to leave. Defendant appeared intoxicated to Keith; he "just seemed real nervous when I told him I couldn't help him." Defendant then left.

Around 1:30 on the morning of March 10, 1991, i.e., during the night following the killing, Debbie Dodge observed defendant alone near a pickup she identified as similar to Schultz's truck. Defendant "got out of the truck, took a rag and went around to the passenger side and wiped off the window." He told her "that if I didn't see him by daylight, I never saw him or the truck before." When the truck was later examined for fingerprints, "it appeared that the windows, and the interior rear view mirror had been wiped down."

Around 3:30 that same morning, defendant went to Gary Reep's home and woke him. Defendant was "real hysterical" and said he needed help. Reep saw Schultz's truck with a toolbox in the back. Defendant said he had bought the truck in Oklahoma City and he thought it might be "hot." Defendant said he wanted to sell the truck to get money to buy gasoline to help his brother go to Tijuana or out of the state because he thought his brother would go to prison for vehicular manslaughter. He said "if he couldn't sell the truck, that he was going to drive it off the cliffs there in Paradise." Reep helped defendant hide the truck. Later he showed the sheriff its location. Defendant also told Reep he had carpentry tools to sell, including Makita drills. He left some of the tools in Reep's yard, which Reep turned over to the sheriff. Defendant also tried to sell some tools, including a Makita drill, to Keith Schulz.

Reep's testimony, the testimony of an employee of the pawnshop, and pawnshop records, confirmed that Lonnie, with defendant and Reep, later

pawned some Makita tools that had belonged to Schultz. The pawnshop employee testified that defendant tried to pawn the tools himself. He did not have an adequate photographic identification, so his brother did it instead.

Blood was found on the passenger door and doorjamb of Schultz's truck and on a pair of blue jeans found in Dodge's apartment. The evidence of who wore the jeans was inconclusive. Lonnie testified that he wore blue jeans and defendant wore "grayish and blue jeans" the night of the killing, but Christine Hoover testified during the defense portion of the case that Lonnie wore "black acid wash" jeans. Janice Murphy testified that defendant was wearing blue jeans the night of the killing; Teresa Schulz testified he was wearing jeans when she saw him shortly after the killing.

Dodge testified that shortly after the killing she noticed that a knife that Lonnie said was similar to the one used in the killing was missing from her kitchen. Defendant had cooked in that kitchen and occasionally used her knives.

Gary Reep testified that a few days after the crime, defendant called him on the telephone. Defendant told him that the tools they had pawned had belonged to a "dead man," but he had told the sheriff he bought them from Reep. He said the sheriff would come to see Reep about the tools, and asked him to say they had belonged to him. Janice Murphy testified that she called defendant after she saw a picture of Schultz on television. Defendant discouraged her from calling the police. He said that "as long as we don't say nothing nobody has to know we were with him." When Murphy called him again later, she asked him what he had done with Schultz. He "was rather evasive and wanted to change the subject." Two witnesses confirmed that when defendant was arrested, he told Lonnie to "remember." Dodge testified that after his arrest, defendant told her on the telephone that "there was no way" anyone could "get him for the murder, because there was no evidence of them ever being there," i.e., they could not place him at the scene.

## 2. *Defense Evidence*

Defendant presented evidence of some of Lonnie's prior inconsistent statements. Even after defendant had said to him, "Remember, Lonnie," Lonnie denied that defendant had threatened him.

Christine Hoover, who lived in the apartment with Dodge, testified that the night of the killing, she saw defendant in a truck outside the apartment with two other persons, a man and a woman. Lonnie was outside the truck. Lonnie, but not defendant, came back inside the apartment. Lonnie told her

he was going with defendant to take the others home. Later that morning, she saw both defendant and Lonnie in the apartment.

A defense investigator testified that Dodge told him that Lonnie had told her, in the context of the Schultz stabbing, that defendant "made me do it." She also told the investigator, "Lon didn't do it. Dan made him do it. Lon said he was afraid of Dan." She also said that Lonnie told her that defendant had threatened that if he, Lonnie, "told anybody, [he] would end up the same way."

### 3. *Rebuttal*

The prosecution presented evidence of prior inconsistent statements of Christine Hoover. One officer testified that when he interviewed her, she seemed very "mixed up" about the events the night of the killing.

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution presented evidence of various other crimes involving force or violence that defendant had committed. Defendant raped a college student in Oklahoma in 1980. Later he and a cohort sexually assaulted her again at knifepoint. He repeatedly assaulted a woman with whom he had a relationship in the 1980's and members of her family. He assaulted his landlord in 1986, knocking out several teeth and sending him to the hospital. For this incident he was convicted of battery. He assaulted two men in New Orleans in 1988, for which he was convicted of battery and disturbing the peace. He assaulted two women in Montana in 1989, giving one a concussion and hitting the other with a gun. Later he assaulted one of the women again, breaking her jaw. As a result, he was convicted of assault in Montana. He threatened an Arizona police officer and tried to kick him, for which he was convicted of disorderly conduct in Arizona. He raped and beat a woman in Washington State in 1990. He assaulted his aunt and cousin repeatedly when he was young, once with nunchakus. He committed lewd acts with his sister, for which he was convicted in Oklahoma of "indecent or lewd acts with a child under fourteen." When she yelled for help, defendant threatened the family with a .22-caliber rifle. Other evidence indicated he once assaulted a friend of his mother with a brick, requiring stitches. He also committed crimes against his brother, Lonnie, including sexual assaults.

### 2. *Defense Evidence*

Defendant's mother testified about his troubled childhood. His father, Donald, abused her repeatedly, sometimes in front of their children. Donald

never cared for the children, including defendant. Defendant did poorly in school and dropped out in the ninth grade. He abused alcohol and drugs. Kenneth Hillhouse, defendant's brother, testified that their father victimized the family and never showed the children any affection. Defendant started drinking alcohol and smoking marijuana when he was 12 years old. Defendant's sister testified that he was a father figure to her until the lewd act incident leading to defendant's conviction when she was 12 years old. A cousin of defendant's testified Donald abused defendant's mother. She believed Donald was an alcoholic.

Four mental health experts testified about defendant's mental condition. Dr. John Wicks, a medical clinical psychologist, tested defendant extensively and believed he had "a pattern that suggests organic brain damage." Defendant's overall IQ was in the 80's, which "put him in the low normal or dull normal range of intelligence." Some of defendant's mental functions were impaired, including "the ability to inhibit impulses, . . . to make the good judgment, . . . to put yourself in the place of another person and intuitively feel what their world would be like." Defendant's mental age was "arrested on the average, with most of his skills, about ten to twelve years old." He would function better in a structured environment such as a penal institution.

Dr. Gretchen White, a clinical psychologist, studied defendant's life history and believed that he "is an individual with multiple problems of his own who came from a severely dysfunctional family, who showed problems in the family and multiple risk factors throughout." She said "the deck was pretty much stacked" against defendant.

Dr. Stephen Pittel, a psychologist, testified that defendant has long been an alcoholic. "He experiences major personality changes while under the influence of alcohol" and has reported blackouts. Because of his background and neurological problems, he is particularly vulnerable to substance abuse.

Dr. Judy Brislain, an expert in diagnosis and treatment of learning disability, testified that defendant's poor performance on various standardized tests indicated defendant had organic brain damage and a learning disability. She also believed that defendant probably "stopped developing psychosocially between the ages of five and twelve." Nevertheless, she believed that defendant could learn if placed in a "very structured environment."

## II. DISCUSSION

### A. Jury Selection

Defendant argues the trial court erred in denying his challenges for cause to five prospective jurors. However, he has not preserved the issue for

appeal. He exercised only 11 peremptory challenges, leaving him with nine remaining when he accepted the jury. (Code Civ. Proc., § 231, subd. (a).) "To preserve a claim of error in the denial of a challenge for cause, the defense must exhaust its peremptory challenges and object to the jury as finally constituted." (*People v. Millwee* (1998) 18 Cal.4th 96, 146 [74 Cal.Rptr.2d 418, 954 P.2d 990].) Defendant did neither. He seeks to justify his failure to do so by arguing that "trial counsel was faced with a pattern of the trial court's denial of [his] challenges for cause . . . ." Even if this be so, it does not justify the failure to preserve the issue. Defendant had ample peremptory challenges remaining to remove all of the jurors at issue. (*Ibid.*) Moreover, whatever the scope may be of the trial court's power or duty to excuse biased jurors sua sponte, any failure to do so does not "excuse defendant's failure to preserve this issue for review." (*People v. Bolin* (1998) 18 Cal.4th 297, 316-317 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

Defendant also argues that one of the five persons that he challenged was not only a prospective juror but ultimately an *actual* juror. This circumstance does not change the rule. Defendant could have used a peremptory challenge to remove this juror but chose not to do so. Accordingly, defendant may not now complain that he was an actual juror. (*People v. Danielson* (1992) 3 Cal.4th 691, 712-713 [13 Cal.Rptr.2d 1, 838 P.2d 729].) Nothing in *United States v. Martinez-Salazar* (2000) 528 U.S. 304 [120 S.Ct. 774, 145 L.Ed.2d 792] compels a different result. In that case, the high court interpreted *federal* law, specifically rule 24 of the Federal Rules of Criminal Procedure (18 U.S.C.), as not requiring a defendant to excuse a prospective juror in order to preserve the issue of the trial court's denial of a challenge for cause. (*United States v. Martinez-Salazar, supra*, 528 U.S. at pp. 314-315 [120 S.Ct. at p. 781].) However, the court recognized that *state* law may be different. (*Id.* at pp. 313-314 [120 S.Ct. at pp. 780-781] [citing *Ross v. Oklahoma* (1988) 487 U.S. 81 [108 S.Ct. 2273, 101 L.Ed.2d 80]].) In *Ross v. Oklahoma, supra*, 487 U.S. at page 89 [108 S.Ct. at page 2279], the court noted that under Oklahoma law, "a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." The court found "nothing arbitrary or irrational about such a requirement, which subordinates the absolute freedom to use a peremptory challenge as one wishes to the goal of empanelling an impartial jury." (*Id.* at p. 90 [108 S.Ct. at p. 2779].) As noted, the California rule is similar to Oklahoma's. Defendant's current claim is not cognizable.

Even if the issue were cognizable, defendant would not prevail. As to the four individuals who did not sit on defendant's jury, "[d]efendant could not

possibly have suffered prejudice as a result of the court's refusal to excuse them at his request." (*People v. Millwee, supra,* 18 Cal.4th at p. 146; see also *Ross v. Oklahoma, supra,* 487 U.S. at p. 86 [108 S.Ct. at p. 2277].) As to the actual juror, we see no error.

■ A party may challenge a prospective juror for actual bias, defined as a state of mind that would prevent that person from acting impartially and without prejudice to the substantial rights of any party. (*People v. Ayala* (2000) 24 Cal.4th 243, 271-272 [99 Cal.Rptr.2d 532, 6 P.3d 193].) On review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it. (*Id.* at p. 272.)
■ Here, the juror's statements were equivocal and somewhat conflicting. Accordingly, we must defer to the trial court's determination of his state of mind.

In the juror questionnaire, the juror wrote that due to information about this case he read in newspapers, he "believe[d] the defendant is guilty, it's a matter only of 1st or 2nd degree." He also stated that the prosecution investigator in the case "is a friend from the Elks." As might be expected given these answers, the court and parties questioned the juror extensively in court regarding his ability to be impartial. The juror gave some answers that certainly would have warranted the court in removing him. He gave other answers, however, warranting the conclusion that he could be impartial. He made clear that he had preconceptions about the case, but he also understood he had to base his decision on the evidence at trial rather than what he read in newspapers, and he said he would try to be impartial. He summarized his feelings: "I think the defense attorney has an up-hill battle, *if I were asked to make a judgment today* I already stipulated what that judgment would be [i.e., guilty], but as I hear conflicting information I think I could be fairly impartial to listening to that." (Italics added.) The court assured the juror that he would *not* be asked to make a judgment that day but only after hearing the evidence.

On this record, the trial court could reasonably conclude the juror was trying to be honest in admitting to his preconceptions but was also sincerely willing and able to listen to the evidence and instructions and render an impartial verdict based on that evidence and those instructions. Indeed, a juror like this one, who candidly states his preconceptions and expresses concerns about them, but also indicates a determination to be impartial, may be preferable to one who categorically denies any prejudgment but may be disingenuous in doing so. A reviewing court must allow the trial court to

make this sort of determination. The trial court is present and able to observe the juror itself. It can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript. We see no basis on which to overturn the trial court's determination that this juror could be impartial.

### B. *Guilt Phase Issues*

#### 1. *Issues Regarding Witness Lonnie Hillhouse*

■ Defendant raises a number of interrelated evidentiary and instructional issues regarding Lonnie, a key prosecution witness. He argues that Lonnie should not have been allowed to testify because the plea bargain by which he pleaded guilty to second degree murder was coercive. Defendant did not object to the testimony at trial, so the issue is not cognizable on appeal. (*People v. Riel* (2000) 22 Cal.4th 1153, 1178-1179 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Defendant claims his attorneys were ineffective in failing to object. ■ To establish this claim, defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that he was prejudiced, i.e., that it is reasonably probable the result would have been more favorable had counsel acted competently. (*Id.* at p. 1175.) ■ As in *People v. Riel, supra*, 22 Cal.4th at page 1179—where, like here, a coparticipant and original codefendant pleaded guilty to murder and testified against the defendant—"he has shown no basis on which to exclude [the witness's] testimony."

When Lonnie pleaded guilty to the reduced charge of second degree murder, he signed an agreement that he would "testify truthfully if subpoenaed to so testify at the trial of Danny Ray Hillhouse in this matter." The agreement said nothing else regarding the content of Lonnie's testimony. Nothing in this agreement was coercive or otherwise improper. Although an agreement compelling the witness to testify in a particular fashion would be improper, an agreement that only requires the witness to tell the truth is valid. (*People v. Riel, supra*, 22 Cal.4th at p. 1179.)

Defendant argues that even if the agreement purported only to compel Lonnie to tell the truth, Lonnie *understood* it to compel him to testify in a particular way. Even assuming that such an understanding, as distinct from the actual terms of the agreement, could invalidate the agreement, the record does not support defendant's claim. After Lonnie agreed to the plea bargain, he gave a statement to a prosecution investigator. His subsequent testimony at the preliminary hearing and at trial was consistent with this statement. Defendant claims that Lonnie understood the plea agreement to compel him

to testify consistently with that statement. However, the agreement could not have compelled Lonnie to testify in accordance with the statement, for the statement came months *after* the agreement. Moreover, nothing in the agreement or the statement suggests the prosecution expected Lonnie to testify in any particular fashion other than truthfully.

In arguing to the contrary, defendant relies largely on testimony defense counsel elicited from Lonnie on cross-examination. Defense counsel asked: "[W]as it your understanding by the time you were testifying a month or so later [after making the statement], at this preliminary hearing, having accepted this plea bargain, if you changed your story from the last one you gave the investigator, the DA can say you're lying and come back and send [you to] prison for the rest of your life, that was your understanding wasn't it?" Lonnie responded, "I do believe it was." But Lonnie also said that his preliminary hearing testimony was consistent with the statement because "it's the truth." He explained that the statement was the first time he had told the full truth: "I think once that I came . . . out with the full facts of the truth, then I wasn't going to change. Why would I want to change the truth." In context, Lonnie said only that he felt obligated to testify consistently with the statement because it was the truth, and he felt obligated to tell the truth. Defendant also notes that during the interview, Lonnie asked to see the "police reports." This circumstance may merely show that Lonnie wanted to refresh his recollection. It does not compel the conclusion he felt obligated to testify in any particular fashion other than truthfully. In short, the jury heard the facts regarding the plea agreement, Lonnie's understanding of it, and his prior statements. In light of the actual agreement, allowing a fully informed jury to judge the witness's credibility for itself fully protected defendant's rights. (*People v. Riel, supra,* 22 Cal.4th at pp. 1180-1181.)

Defendant also argues that Lonnie's testimony was too incredible to believe. As in the similar situation in *People v. Riel, supra,* 22 Cal.4th at page 1181, reasons do indeed exist for the jury to have questioned Lonnie's credibility. He had an obvious motive to minimize his own involvement in the crime. He had made many prior inconsistent statements and admitted to the jury he had lied about the crime. He said he originally lied to protect himself and defendant. But Lonnie's overall testimony was credible, or so the jury could reasonably have found. Defendant argues it was contradicted in some respects by other witnesses and the physical evidence. He discusses the evidence in great detail, reiterating many points the defense made at trial in trying to discredit Lonnie. "But these circumstances—known to the jury—do not provide a basis to exclude his testimony." (*Ibid.*) Defendant also notes that on a few points, such as whether the knife had a flimsy blade, Lonnie said his was a "commonsense" answer. He claims this shows Lonnie

was unable "to grasp the role of a witness in a judicial proceeding." We disagree. As a whole the record shows that Lonnie understood his duty to tell the truth. His credibility was for the jury to determine under all the circumstances.

Defendant also argues that "even the prosecutor questioned Lonnie's credibility." On the contrary, the prosecutor argued that Lonnie's basic testimony was credible. She did additionally argue, as a backup position, that even if the jury disbelieved him and believed that he, not defendant, had been the actual killer, then defendant was nonetheless guilty of murder on an aider and abettor theory. Such argument is entirely appropriate. Moreover, even if the prosecution had questioned Lonnie's credibility on some points, defendant would have had no basis to complain. As we explained in *People v. Riel, supra,* 22 Cal.4th at pages 1181-1182, the prosecutor was not present at the crime scene and therefore did not personally know whether or to what extent Lonnie might be lying at trial. "The prosecution simply presented its evidence and allowed a fully informed jury to evaluate it." (*Id.* at p. 1181.) Allowing Lonnie "to testify subject to cross-examination and impeachment by available evidence, as was done here, afforded defendant a fair trial and comported with due process." (*Id.* at p. 1182.)

Over defense objection, the trial court ruled that Lonnie's prior statements that predated his plea agreement and were consistent with his trial testimony would be admissible as prior consistent statements under Evidence Code section 791. Accordingly, it admitted part of a statement Lonnie made several months before the plea bargain. Defendant contends the court erred. We disagree. Evidence Code section 791, subdivision (b), provides that a prior consistent statement may be admitted to support a witness's credibility if "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." Here, as the trial court noted in its rulings, defense counsel cross-examined Lonnie extensively regarding the plea agreement and at least implied that Lonnie was testifying as he did because of that agreement. Arguing to the contrary, defendant asserts, "No new motive for fabrication is engendered by the plea bargain." This assertion contradicts his argument, discussed above, that the plea agreement was so coercive as to be illegal. As we have explained, the agreement was valid in the sense that it did not disqualify Lonnie from testifying. But the defense was entitled to, and did, use it at trial to try to cast doubt on Lonnie's credibility. This circumstance made the consistent statements predating the agreement admissible to support his credibility.

Defendant argues that Lonnie had a motive to minimize his role in the crime even before he made the prior consistent statements. This is no doubt

true, but defendant also implied at trial that the plea agreement provided an *additional* improper motive. A prior consistent statement logically bolsters a witness's credibility whenever it predates *any* motive to lie, not just when it predates all possible motives. Accordingly, under Evidence Code section 791, "a prior consistent statement is admissible as long as the statement is made before the existence *of any one of the motives* that the opposing party expressly or impliedly suggests may have influenced the witness's testimony." (*People v. Noguera* (1992) 4 Cal.4th 599, 629 [15 Cal.Rptr.2d 400, 842 P.2d 1160], italics added.) The statement admitted here comes within this rule.

■ Defendant also argues the court misinstructed the jury regarding how to view Lonnie's testimony. The court told the jury that Lonnie was an accomplice as a matter of law and gave the then standard instructions regarding accomplice testimony, including that it must be corroborated and should be viewed with "distrust." (CALJIC Nos. 3.11, 3.12, 3.18 (5th ed. 1988).) The only substantive difference between the instructions the court gave and the current standard instructions is that currently, the standard instructions tell the jury to view accomplice testimony that incriminates the defendant with "caution," rather than "distrust." (CALJIC No. 3.18 (1999 rev.) (6th ed. 1996); see *People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].) Thus, the actual instruction was more favorable to defendant than the current standard instruction, a circumstance about which defendant cannot complain. Instead, he argues the court erred in refusing additionally to give two special instructions he requested that elaborated on these instructions. We disagree. The actual instructions were adequate.

Regarding the corroboration requirement, the court instructed: "To corroborate testimony of an accomplice, there must be evidence of some fact or facts related to each crime which if believed, by itself, and without any aid, interpretation or direction from the testimony of the accomplice tends to connect the defendant with the commission of each crime charged. [¶] However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of each crime charged or that it corroborates every fact to which the accomplice testifies." Defendant's first requested instruction would have added: "It is not sufficient corroboration if the evidence merely shows an association between the accomplice and the person who committed the offense, or merely places the defendant at the scene of the crime, or merely casts a grave suspicion upon the defendant." The trial court correctly refused this instruction. The actual instructions correctly stated the law. (§ 1111; *People v. Sanders* (1995) 11 Cal.4th 475, 534 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Szeto* (1981) 29 Cal.3d 20,

26-27 [171 Cal.Rptr. 652, 623 P.2d 213].) Informing the jury of the standard for corroboration was sufficient; it was not necessary additionally to describe any particular type of evidence that would *not* be sufficient. (*People v. Ochoa* (2001) 26 Cal.4th 398, 446 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Williams* (1980) 101 Cal.App.3d 711, 718-719 [161 Cal.Rptr. 830].) Moreover, telling the jury that evidence merely casting a grave suspicion on the defendant is insufficient would have been confusing at best, incorrect at worst. Evidence that casts a grave suspicion on the defendant might well tend to connect him with the crime.

As noted, the court instructed the jury to view Lonnie's testimony with "distrust." Defendant asked the court to add that the testimony should be "received with care, caution, and suspicion for the reason that its very source is tainted. You must not accept the words of an accomplice at face value, or with any presumption of truthfulness, or judge them by the same standards as that applied to other witnesses. [¶] An accomplice may have many self-serving motives that may influence his credibility, such as the hope or expectation of leniency in return for testimony which would help to convict another." The requested instruction was argumentative and would have been inappropriate. (See *People v. Ochoa, supra,* 26 Cal.4th at p. 446.) Indeed, after the trial here, we even disapproved the word "distrust," which the trial court used, preferring instead the word "caution." (*People v. Guiuan, supra,* 18 Cal.4th at p. 569.)

Defendant also complains of an instruction informing the jury it may reject the testimony of a witness who testified falsely "unless from all the evidence you believe the probability of truth favors his or her testimony in other particulars." (See CALJIC No. 2.21.2.) He argues the phrase "probability of truth" impermissibly lowers the prosecution's burden of proof. We rejected a similar argument in *People v. Riel, supra,* 22 Cal.4th at page 1200. Although this instruction did not itself explain the reasonable doubt standard of proof, it did not undermine other instructions that did do so.

### 2. *Limitation on Cross-examination of a Witness*

Gary Reep testified for the prosecution about defendant's attempts to hide the truck and defendant's role in pawning the victim's tools. On direct examination, he testified that he had discussed the case with the police. On cross-examination, defense counsel asked whether Reep would talk to him. Reep responded, "No, sir." But then the court sustained a relevance objection by the prosecutor, who argued, "Every witness has a right to not talk to either the prosecution or defense." Defendant contends the court erred in violation of his Sixth Amendment right to confront witnesses.

We agree the court erred under state law in sustaining the relevancy objection. A witness's refusal to talk to a party is relevant to that witness's credibility because it shows the possibility of bias against that party. (*People v. Hannon* (1977) 19 Cal.3d 588, 601-602 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People v. Shaw* (1896) 111 Cal. 171, 174 [43 P. 593].) The court here erred in concluding otherwise. Although the court may have had discretion under Evidence Code section 352 to exclude the question, that was not the basis of its ruling. Nevertheless, we do not agree the error constituted a violation of defendant's Sixth Amendment confrontation right.

" '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citations.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

The trial court's sustaining of this single objection did not violate the Sixth Amendment under this standard. The court generally allowed the defense full scope to cross-examine Reep. Although the disallowed question was relevant to credibility, refusing to talk to an attorney is not a prototypical form of bias. A witness may choose not to talk to an attorney for many reasons unrelated to bias or favoritism. Reep may have been only a reluctant witness. Having given a statement to the police, which was discoverable by the defense, he simply may not have wanted to give yet another statement to an attorney who would be cross-examining him. Not allowing the jury to consider that refusal did not produce a significantly different impression of his credibility.

The error under state law was harmless. Although Reep corroborated some of Lonnie's testimony, he was not a critical witness. Nor was his credibility particularly suspect, even considering that he did not want to talk to defense counsel. It is not reasonably probable the result would have been

different had the jury considered Reep's refusal to talk to defense counsel. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Indeed, we would find the error harmless beyond a reasonable doubt.

### 3. *Exclusion of Evidence of the Victim's Marijuana Use*

Lonnie testified that while he and defendant were driving Schultz to their eventual fatal encounter, Schultz asked where they were going. Defendant replied that they were going to his "wife's house to get some pot." On cross-examination, defense counsel elicited that Lonnie had earlier told an investigator that Schultz had responded, "far out," although Lonnie could not recall that response at trial. Outside the presence of the jury, defense counsel represented that the toxicology report showed "the presence of marijuana in [the victim's] system." He argued that in light of Lonnie's testimony, this evidence was admissible as "relevant to show that they were traveling some place for that express purpose" rather than some other purpose. The court excluded the evidence the next day as unduly prejudicial under Evidence Code section 352.

Later, the defense sought to question Lonnie regarding marijuana use the night of the crime. Outside the presence of the jury, Lonnie testified he did not smoke marijuana and did not see Schultz or defendant do so. He denied telling anyone anything different. The court ruled the defense could ask the same questions in front of the jury. Defense counsel also represented that Lonnie had made inconsistent statements to a defense expert. The next day, the prosecutor represented that the defense expert had told her he had not asked Lonnie anything regarding marijuana use. Defense counsel argued that Lonnie's testimony and the alleged inconsistent statements tended "to corroborate the whole subject matter of the plan for marijuana, reference of marijuana during the course of that evening. . . . [I]t tends to corroborate or make more valuable the information that we have that Mr. Schultz had some marijuana metabolites within his blood system after his death." The court ruled the defense could question Lonnie regarding marijuana use and impeach him with any inconsistent statement, but it could not present evidence of marijuana in Schultz's system. In front of the jury, defense counsel asked Lonnie if he or defendant had smoked marijuana that night and whether he had told the defense expert that he and defendant had "shared a joint," eliciting a negative response to each question. The defense did not present any inconsistent statement.

Defendant contends the court erred in disallowing evidence that the toxicology report showed the presence of marijuana in the victim's system. He argues the evidence was relevant to show that the purpose of the drive

was, indeed, to get some marijuana rather than something more nefarious. However, the ruling comes within the "broad discretion" the "trial court enjoys" under Evidence Code section 352 "in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Specifically, the court is not required to admit evidence, such as cocaine or marijuana use, "that merely makes the victim of a crime look bad." (*People v. Kelly* (1992) 1 Cal.4th 495, 523 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Contrary to defendant's argument, these basic rules of evidence do not violate a defendant's constitutional right to present a defense. (*People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145].)

Here, Lonnie testified that defendant told Schultz they were driving to get some marijuana. Evidence of actual marijuana in Schultz's system may have explained why defendant would try to reassure him by saying they were going to get some marijuana. It may further have helped show that Schultz liked the idea and maybe even that getting marijuana was *his* purpose for the trip. But Schultz's purpose was of little significance. *Defendant's* purpose was important, not Schultz's. Schultz's marijuana use had little relevance, if any, to show defendant's purpose. Moreover, whether defendant actually intended to get marijuana, rather than merely saying so to reassure Schultz, was itself of little significance. Because the trip in the truck was consensual, it did not form part of the prosecution theory of kidnapping. Moreover, any assumed intent to get marijuana would not negate the other evidence of intent to rob or kill, which easily could have coexisted with that assumed intent. We see no abuse of discretion.

### 4. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support the judgment in several respects.[2] ▇ In reviewing a criminal conviction challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The same standard applies to special circumstance allegations. (*People v. Ochoa* (1998)

---

[2]As to some of these contentions, defendant also argues the trial court erred in denying his motion to acquit for insufficient evidence. (§ 1118.1.) This argument merely repeats the same insufficiency argument in a different form. (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Accordingly, we do not discuss it separately.

19 Cal.4th 353, 413-414 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We conclude that the evidence was insufficient to support the kidnapping for robbery conviction and kidnapping-murder special circumstance and otherwise find sufficient evidence supports the judgment.

### a. *General Insufficiency*

Defendant argues that Lonnie's testimony, even if admissible, was insufficient to support any of the convictions. We disagree for reasons similar to those we stated in rejecting similar arguments in *People v. Riel*, *supra*, 22 Cal.4th at page 1182. Lonnie's credibility was for the jury to determine, not an appellate court. His testimony, if believed, as the jury clearly did at least in large measure, provided solid evidence of defendant's involvement in these crimes. Moreover, the jury did not have to believe every detail of that testimony to find defendant guilty of the charges or even to return a verdict of death; indeed, it could have suspected that Lonnie downplayed his own role while still reasonably finding defendant guilty beyond a reasonable doubt.

Lonnie's testimony was not all that incriminated defendant. Although Lonnie alone provided the details of exactly who did what that night after the truck stopped, other evidence connected defendant with the crime. Independent evidence showed that Schultz was with defendant in the truck when last seen alive by someone other than the Hillhouse brothers; crime scene evidence supported Lonnie's testimony that the body had been dragged; Dodge saw defendant wiping fingerprints off the truck alone in the middle of the night; defendant had access to the knife missing from Dodge's kitchen that may have been the murder weapon; defendant wanted to sell Schultz's truck and then hid it; he attempted to sell and, with Lonnie's help, pawned some of the victim's tools; he also acted suspiciously and made suspicious comments to various persons after the crime, showing a consciousness of guilt. Defendant's actions, shown by independent witnesses, strongly suggest that he, not Lonnie, was the leader of the two brothers and that he took the leadership role in the crime. "Accordingly, 'we cannot conclude that [Lonnie's] testimony rendered either the capital conviction or the death sentence unreliable.' " (*People v. Riel*, *supra*, 22 Cal.4th at p. 1182.)

### b. *Kidnapping for Robbery and the Kidnapping-murder Special Circumstance*

The jury convicted defendant of kidnapping Schultz for robbery and found true a kidnapping-murder special circumstance. The trial court

also instructed on kidnapping as a theory of first degree felony murder. As the court instructed the jury, the kidnapping count was not based on the movement in the truck, for there was no evidence that movement was against Schultz's will. Rather, the kidnapping charge was based solely on the dragging of Schultz after he was stabbed. The evidence showed defendant and Lonnie dragged him around 100-150 feet to a place difficult to see from the road.

Section 209, subdivision (b), makes guilty of kidnapping for robbery "Any person who kidnaps or carries away any individual to commit robbery . . . ." "Kidnapping for robbery, or aggravated kidnapping, requires movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself." (*People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369].) Defendant argues several reasons the evidence was insufficient to sustain the conviction and special circumstance. We need not consider all of the arguments, for we find one to be dispositive: the evidence was insufficient to prove that Schultz was still alive at the time of the dragging.

There can be no doubt that, like rape (*People v. Kelly, supra,* 1 Cal.4th at p. 524), kidnapping in general, and kidnapping for robbery in particular, requires a live victim. The Attorney General does not argue otherwise. If one kills, then moves the body, the crimes committed do not include kidnapping. The statutory references to a "person" (§ 207, subd. (a)) or an "individual" (§ 209, subd. (b)), as the kidnapping victim, clearly contemplate someone alive. Indeed, no further harm can befall someone already dead; asportation of a corpse cannot increase the risk of harm.

The evidence regarding whether Schultz was dead or alive when defendant dragged him is inconclusive, but most of it indicates he was probably already dead. Lonnie testified that all the stabbing occurred by the truck before the movement and said that the body never moved on its own or made a sound during any of the dragging. Dr. Gwen Hall, the pathologist who performed the autopsy, provided the most important testimony. Schultz died of four stab wounds, each of which independently could have been fatal. The injuries themselves indicated Schultz could have survived "minutes, perhaps twenty minutes to an hour at the most." This testimony alone would suggest that Schultz might have survived during part or all of the dragging. But Dr. Hall also testified that a certain head bruise caused by hitting something like a car door or the ground (i.e., likely caused when Schultz fell after the stabbing) occurred "at or about the time of death." More importantly, abrasions on the back, obviously caused during the dragging, showed no

signs of bleeding. The absence of bleeding "suggested" to Dr. Hall that the body was already dead when it suffered the abrasions, although she could not say with "absolute certainty." Thus Dr. Hall's testimony, as a whole, indicates Schultz was probably dead when his body was dragged.

Citing Dr. Hall's testimony that she could not be certain exactly how long Schultz lived, the Attorney General argues that "the absence of bleeding under the abrasions on [Schultz's] back is not conclusive evidence that he was dead at the time of the dragging." But, as defendant notes, the question is not whether the evidence conclusively proved Schultz was dead, but whether substantial evidence supported a finding he was alive. We see no such substantial evidence. Moreover, even if we assume Schultz was dying but not yet dead when the dragging began and died during the dragging, before receiving the bloodless abrasions, no evidence supports a finding that the movement "*substantially* increase[d] the risk of harm . . . ." (*People v. Rayford, supra,* 9 Cal.4th at p. 12, italics added.) The primary harm—the four stab wounds, each alone potentially fatal—had already occurred; any additional harm was insubstantial.

Accordingly, the kidnapping for robbery conviction and the kidnapping-murder special circumstance cannot stand. Finding that defendant dragged Schultz's body after, rather than before, he killed Schultz does not minimize the heinousness of defendant's deeds. It does, however, mean he was not guilty of kidnapping in addition to murder and robbery.

Defendant also argues that because the court instructed the jury on kidnapping as a theory of felony murder, we must also reverse the first degree murder conviction. We disagree. As we explain, the evidence supported the robbery and robbery-murder special-circumstance findings as well as the lying-in-wait special-circumstance finding. These findings show the jury necessarily concluded the killing was committed in the course of a robbery and by lying in wait. Thus, we know that the first degree murder verdict rested on at least one correct theory. (§ 189; *People v. Kelly, supra,* 1 Cal.4th at p. 531; see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].)[3]

### c. *Robbery and the Robbery-murder Special Circumstance*

Defendant also argues the evidence was insufficient to sustain the robbery conviction and robbery-murder special-circumstance finding. He

---

[3]Defendant also argues that the court erred in responding to a jury question regarding the kidnapping charge. Because we set aside that charge on other grounds, we need not consider the contention.

essentially argues that at most there was a theft, and the use of force, i.e., the killing, occurred either before or after any taking and was not accompanied by an intent to steal. (See *People v. Green* (1980) 27 Cal.3d 1, 52-54 [164 Cal.Rptr. 1, 609 P.2d 468].) We disagree. Lonnie testified that defendant told him at an early stage that Schultz had money, and he was going to kill him and take it. The two brothers then took money from Schultz while driving, looked through the pockets after dragging the body, then took the truck and tools. This evidence amply supports the conclusion that defendant intended to rob Schultz from the time he began driving him to the spot where he killed him, and that robbery was an intent behind the killing.

### d. *The Lying-in-wait Special Circumstance*

The jury found true the special circumstance of murder by means of lying in wait, and the court also instructed the jury on lying in wait as a theory of first degree murder. Defendant contends the evidence was insufficient to support either the special circumstance finding or the first degree murder instruction. We disagree.

"The requirements of lying in wait for first degree murder under Penal Code section 189 are 'slightly different' from the lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15). [Citation.] Defendant challenges the sufficiency of the evidence as to both. We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' [Citations.] 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" (*People v. Carpenter* (1997) 15 Cal.4th 312, 388 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

We find sufficient evidence of each of these elements. Lonnie testified that defendant told him at an early stage of an intent to kill Schultz. Defendant concealed his purpose from Schultz until he struck. The evidence shows a substantial period of watching and waiting for an opportune time to act—which arose when Schultz asked defendant to stop the truck and got out and urinated. Immediately thereafter, while the victim was still urinating—

and hence particularly vulnerable—defendant attacked from a position of advantage. He took Schultz by surprise with no opportunity to resist or defend himself. Defendant notes that earlier opportunities existed for defendant to kill an unconscious Schultz in the truck. However, "[a]s long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking his victim by surprise." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1145 [17 Cal.Rptr.2d 375, 847 P.2d 55].) The jury could reasonably conclude that defendant found that the most opportune time to take Schultz by surprise came when he had stepped outside the truck and started to urinate. Stabbing him under those circumstances avoided having the victim bleed in the truck and facilitated hiding the body.

Citing Lonnie's testimony that defendant said something inaudible, Schultz responded, "Don't fuck with me while I'm peeing," defendant said, "I ought to kill you," and only then stabbed, defendant also argues the evidence shows that the stabbing was a spontaneous reaction to a "roadside disagreement with Schultz." The jury, however, could reasonably have concluded otherwise—that defendant planned the killing to rob Schultz, and he waited and watched for the opportune moment to strike, which presented itself when Schultz was urinating.

Defendant also argues, and the concurring and dissenting opinion would find, that defendant's comment that he ought to kill Schultz precludes the jury from finding he attacked an unsuspecting victim by surprise from a position of advantage. In effect, he argues that the jury was required, as a matter of law, to find the comment was an advance warning that negated either surprise or his position of advantage. We disagree. The comment appears to have been virtually simultaneous with the stabbing, or so the jury could reasonably conclude. Despite the comment, the jury could reasonably find that when defendant stabbed a urinating Schultz, he took him by surprise and still had a position of advantage.

5. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed various acts of misconduct during both the guilt and penalty phases.[4] However, with two penalty phase exceptions noted below, he did not object at trial. Because an objection could have cured any harm, the contentions, with the two exceptions, are not cognizable on appeal. (*People v. Riel, supra,* 22 Cal.4th at pp. 1196-1197.) It is true that in an extreme case, when misconduct was

---

[4]Although this claim involves both the guilt and penalty phases, we consider the entire claim here because the arguments are intertwined.

pervasive, defense counsel had repeatedly but vainly objected to try to curb the misconduct, and the courtroom atmosphere was so poisonous that further objections would have been futile, we have excused counsel from having to object continually. (*People v. Hill* (1998) 17 Cal.4th 800, 821, 836 [72 Cal.Rptr.2d 656, 952 P.2d 673]; see *People v. Riel, supra,* 22 Cal.4th at p. 1212.) This case was not remotely close to that extreme. The trial atmosphere here was not poisonous, counsel failed to object at all until the penalty phase, and the record fails to establish that objections would have been futile. "The normal rule requiring an objection applies here, not the unusual one applied to the extreme circumstances of *People v. Hill, supra,* 17 Cal.4th 800." (*People v. Riel, supra,* 22 Cal.4th at p. 1213.) Defendant claims counsel were ineffective for not objecting. However, deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance. (*Id.* at p. 1197.) This is not one of those rare cases.

Moreover, this record discloses no misconduct. Defendant claims the prosecutor improperly denigrated defense counsel. Although the prosecution may not attack defense counsel's integrity, it may, and the prosecutor here did, vigorously attack the defense case and argument if that attack is based on the evidence. In turn, the defense may attack the prosecution case and argument, as defense counsel did here. (*People v. Hill, supra,* 17 Cal.4th at p. 832; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215-1218 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47 [18 Cal.Rptr.2d 796, 850 P.2d 1].) We have reviewed the comments defendant cites and find none that was improper. The prosecutor properly, albeit at times strongly, argued that, in *light of the evidence,* much of the defense argument was incorrect, speculative, or misleading.

The two occasions on which the defense did object do not demonstrate misconduct. First, on cross-examination of a defense expert, the question arose how many times the witness had met with defense counsel. The witness said he could only recall four meetings, not a fifth. The prosecutor commented, "Good move. Leave it off your bill." In response to defense counsel's objection "to the continued sarcasm," the court merely said, "proceed." Second, during cross-examination of another defense expert, the witness asked if he could "clarify what a severe diagnosis is." The prosecutor responded, "Please?" (The question mark is in the record, although its significance is not clear.) Defense counsel asked the court to admonish the prosecutor for her "sarcastic, condescending, unprofessional comments, statements to our witnesses . . . ." The prosecutor asked for a bench

conference and, outside the jury's presence, complained about defense counsel's speaking objection in front of the jury. The court commented it did not "observe anything—I heard the witness ask[] if he could explain and the reply was please." Defense counsel complained that the prosecutor's tone of voice was condescending and sarcastic. The court responded it could "only address what's before me—that's the remark, 'please,' and objection overruled as to that." These incidents show neither any impropriety nor that other objections would have been futile.

### 6. *Instructional Issues*

#### a. *Instruction on Motive*

The trial court instructed on the mental states required for the various charges, including that murder requires malice or a killing during the commission of robbery or a kidnapping "for the purpose of robbery," that robbery requires the "specific intent permanently to deprive [the] person of the property," that the force or intimidation required for robbery "must be motivated by the intent to steal," that kidnapping for robbery requires the "specific intent to commit robbery," which must exist when the movement commenced, that kidnapping for robbery requires the "purpose" of robbing, and that the special circumstances of robbery murder and kidnapping murder include the requirements of robbery and kidnapping for robbery. The court also instructed, in accordance with CALJIC No. 2.51, that "[m]otive is not an element of the crime charged and need not be shown."

Defendant argues that telling the jury that motive is not an element of the crimes contradicted the other instructions, because motive *is* an element of the various crimes. The Attorney General counters that the issue is not cognizable because defendant failed to object to these instructions at trial. We disagree to the extent defendant argues the court erred in giving CALJIC No. 2.51. A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial. (E.g., *People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683].) However, defendant argues that motive is an element of the crimes. If he were correct (as we explain, he is not), CALJIC No. 2.51 would have contradicted other instructions regarding the elements of the crimes. Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review. (§ 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

Turning to the merits, although malice and certain intents and purposes are elements of the crimes, as the court correctly instructed the jury, *motive*

is not an element. "Motive, intent, and malice—contrary to appellant's assumption—are separate and disparate mental states. The words are not synonyms. Their separate definitions were accurate and appropriate." (*People v. Snead* (1993) 20 Cal.App.4th 1088, 1098 [24 Cal.Rptr.2d 922].) Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice. Defendant cites *People v. Maurer* (1995) 32 Cal.App.4th 1121 [38 Cal.Rptr.2d 335], which found prejudicial error in giving CALJIC No. 2.51 under its facts. There the defendant had been convicted of misdemeanor child annoyance under section 647.6. The court found that, although motive is not generally an element of a criminal offense, "the offense of section 647.6 is a strange beast," and it *did* have a motive as an element—an unnatural or abnormal sexual interest. (*People v. Maurer, supra,* 32 Cal.App.4th at pp. 1126-1127.) Thus the court found the instructions contradictory, and thereby erroneous. (*Ibid.*) This case is distinguishable. Here, although malice and intent or purpose to steal were elements of the offenses, motive was not.

Defendant notes that the court instructed the jury that the force or intimidation "by which the taking is accomplished in a robbery must be *motivated* by the intent to steal . . . ." (Italics added.) This language did not transform the requirement of an intent to steal into a motive; it merely meant that the force had to be accompanied by the intent to steal. No reasonable juror would consider the use of the word "motivated" in this context as negating the other instructions regarding the necessary mental states. To the extent defendant argues that that single word was ambiguous or confusing, we agree with the Attorney General that this limited argument is not cognizable. If defendant thought a different word than "motivated" in that instruction would have been clearer, he should have requested the change. He did not.

### b. *Reasonable Doubt Standard*

Defendant argues that certain instructions regarding circumstantial evidence, including references to an interpretation of the evidence that "appears" to be reasonable, undermined the reasonable doubt standard and created an impermissible mandatory presumption of guilt. We have rejected these arguments and continue to do so. (*People v. Ray* (1996) 13 Cal.4th 313, 347-348 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Crittenden, supra,* 9 Cal.4th at p. 144.)

### c. *Instruction Regarding the Readback of Testimony*

Defendant contends the "trial court impermissibly restricted the jury's right to request to have testimony reread by instructing them that in

order to hear the testimony the court must first deem it 'material,' and that if any portion of a witness's testimony was requested, the entire testimony had to be reread."[5] He contends the instruction violated section 1138, which provides that during deliberations, "if there be any disagreement between [the jury] as to the testimony," the court must give the jury the "information required." The Attorney General responds, first, that defendant may not make this argument on appeal because he failed to object to the instruction at trial. We disagree.

In *People v. Frye, supra,* 18 Cal.4th at page 1007, we considered whether defendant's lack of objection forfeited a claim of error for not rereading testimony at jury request. We recognized that section 1138 primarily concerns "the *jury's* right to be apprised of the evidence," but we also noted that it implicates a defendant's right to a fair trial. (*People v. Frye,* at p. 1007.) We also noted that two Court of Appeal decisions had found the defendant did not have to object to preserve a similar claim. Those cases reasoned that a defendant should not be allowed to waive the *jury's* right to a rereading of testimony. (*Ibid.,* citing *People v. Litteral* (1978) 79 Cal.App.3d 790 [145 Cal.Rptr. 186] and *People v. Butler* (1975) 47 Cal.App.3d 273 [120 Cal.Rptr. 647].) Ultimately, we did not decide the forfeiture question in *Frye* and instead found any error harmless. (*People v. Frye, supra,* at p. 1007.)

We have doubts that *People v. Litteral, supra,* 79 Cal.App.3d at pages 796-797, and *People v. Butler, supra,* 47 Cal.App.3d at pages 283-284, correctly allowed a defendant to assert a violation of the jury's right to readback of testimony. In general, a defendant may assert, and thus may forfeit, his own rights, but not someone else's. (See *People v. Edwards* (1991) 54 Cal.3d 787, 813 [1 Cal.Rptr.2d 696, 819 P.2d 436] [a defendant may waive his own right to a public trial and may not assert on appeal a violation of the *public's* right].) But, unlike *People v. Frye, supra,* 18 Cal.4th at pages 1006-1008, and the Court of Appeal decisions, the issue here is not whether the court erred in responding to the jury's request to reread testimony, but whether it erred in *instructing* the jury regarding readback of testimony. Even without an objection, a defendant may challenge on appeal

---

[5] The court instructed as follows: "In argument counsel have made reference to refer to transcripts or check the transcript. Let me clarify one thing. You will not have any transcript in the jury room to refer to during your deliberations. *If you want readback of testimony, and I find it to be on a material point, then I'll direct the court reporter to go in and read back testimony.* [¶] *And when you ask for a witness' testimony to be read back, the entire testimony of that witness is read back so that everything is in context.* I think that you will find that once you get back there and start your deliberations, that the twelve of you collectively will have a pretty good recall of what took place in this courtroom. [¶] The procedure for readback is the court reporter comes in and reads the testimony without comment and then leaves. *And if you request it and I find it to be on a material point, you certainly will have that available to you.*" (Italics added.)

an instruction that affects "the substantial rights of the defendant . . . ." (§ 1259.) Although the readback of testimony is primarily for the jury's benefit, it also implicates the defendant's (and prosecution's) rights. (See *People v. Frye, supra*, 18 Cal.4th at p. 1007.) Accordingly, we conclude defendant may challenge the instruction on appeal despite the failure to object at trial.

On the merits, the court did not violate section 1138. It did not refuse to provide any rereading of testimony; indeed, the jury did not request any. Defendant contends the instruction improperly discouraged the jury from doing so. Generally, he claims the instruction was "an unwarranted modification of CALJIC No. 17.43," the standard instruction regarding the rereading of testimony. The CALJIC instruction, however, did not exist until 1993, after the trial in this case. (CALJIC No. 17.43 (1993 new) (5th ed. 1988).) Specifically, defendant challenges the instruction in two respects.

First, defendant objects to the court's implication that it would not permit the rereading of immaterial testimony. It is hard to evaluate this question in the abstract, for it is hard to imagine a jury requesting the readback of truly immaterial testimony. It may be that section 1138, properly construed, requires only the readback of *material* testimony, but we do not have to decide the question here. If the jury had requested a rereading of testimony, and the court had refused it on the basis that the testimony was immaterial, we could have reviewed that ruling. But that did not happen here. Whether or not the court could ever properly refuse to reread requested testimony by finding it to be immaterial, we see no prejudice from the instruction in this case. No reasonable jury would fail to request the readback of testimony it otherwise wanted merely because the court had implied it could only rehear material testimony.

Second, defendant argues the court erred in advising the jury it would hear the entire testimony of any given witness. This portion of the instruction did not violate section 1138. That statute mandates the readback of testimony at jury request, but it does not forbid giving the jury more than it requests so it also receives the context. Defendant speculates the jury may have wanted a rereading of some part of Lonnie's testimony but chose not to request it because the entire testimony was lengthy. Because any request to rehear some of Lonnie's testimony would likely be directed to the direct testimony, we doubt defendant would have complained about rereading the entire testimony, the bulk of which was cross-examination. But in any event, the court made clear it *would* provide any requested rereading of material testimony. Merely informing the jury of the time it may take for rehearing testimony is not impermissible jury coercion. (*People v. Anjell* (1979) 100

Cal.App.3d 189, 202-203 [160 Cal.Rptr. 669].) We see no violation of the jury's or defendant's right to have the jury provided a rereading of testimony on request.

### C. *Penalty Phase Issues*

#### 1. *Evidence of Unadjudicated Criminal Activity*

 Defendant contends that introducing evidence at the penalty phase of unadjudicated criminal activity violates various state and federal constitutional rights. We have repeatedly rejected the contention and continue to do so. (E.g., *People v. Smithey* (1999) 20 Cal.4th 936, 993 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) Defendant contends that these decisions are inconsistent with *Curl v. Superior Court* (1990) 51 Cal.3d 1292, 1302 [276 Cal.Rptr. 49, 801 P.2d 292], where we noted that it would be " 'extremely difficult for a jury to dispassionately adjudicate the constitutional validity of a defendant's prior murder conviction after having found him guilty of first degree murder and being made aware of the fact of the prior murder conviction.' " No inconsistency exists. The reason for a separate penalty phase is to allow the jury to consider evidence that was not admitted at the guilt phase because it might have prejudiced the guilt determination, but that is relevant to the penalty determination once guilt is established. "The penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair." (*People v. Balderas, supra,* 41 Cal.3d at p. 205, fn. 32; see also *People v. Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279].)

#### 2. *Instruction on Considering Aggravating Factors*

 The trial court instructed the jury on the 11 statutory factors it should consider in making its penalty determination. (§ 190.3, factors (a)-(k).) Defendant originally requested the trial court also to instruct the jury that "factors (a) through (c), and (i) which I have just listed are the only factors that can be considered by you as aggravating factors." When the court and parties discussed the instructions, however, defense counsel stated that "based upon a case entitled [*People v. Gordon* (1990) 50 Cal.3d 1223, 1275, footnote 14 [270 Cal.Rptr. 451, 792 P.2d 251]], if the Court intends to give this instruction in any respect, the first sentence we'd request be modified to say 'the factors A through J' and delete 'and I' because that's

what the *Gordon* case says." The court agreed. Accordingly, it instructed the jury, "The factors A through J which I have just listed are the only factors that can be considered by you as aggravating factors, and you cannot take into account any other facts or circumstances as a basis for imposing the penalty of death on the defendant. [¶] If you find any of those factors to be aggravating and to have been established by the evidence, you may consider them in deciding the penalty you will impose in this case. [¶] Although a number of possible mitigating factors have been listed, you cannot consider the absence of any such factors in this case as an aggravating factor. Aggravating factors are limited to those which have been listed for you in these instructions."

Defendant contends this latter instruction erroneously allowed the jury "to consider as aggravating factors sentencing factors which, as a matter of state law, were relevant solely as mitigators." The Attorney General responds that any error was invited. (See *People v. Wader* (1993) 5 Cal.4th 610, 657-658 [20 Cal.Rptr.2d 788, 854 P.2d 80].) We disagree. Defendant clearly preferred the more limited instruction he originally requested. However, in *People v. Gordon, supra*, 50 Cal.3d at page 1275, footnote 14, we said, "Of course, on request a court must give an instruction stating that the jury may consider only penalty factors (a) through (j), and evidence relevant thereto, in determining aggravation." Defendant did not invite any error; he merely acquiesced in our opinion. (See *People v. Lucero* (2000) 23 Cal.4th 692, 723-724 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

On the merits, we find no error. Defendant is correct that "[a] majority of the 11 statutory factors can only be mitigating. (See, e.g., *People v. Gallego* (1990) 52 Cal.3d 115, 200 [276 Cal.Rptr. 679, 802 P.2d 169] [§ 190.3, factors (e), (f), (g) and (j)]; *People v. Whitt* (1990) 51 Cal.3d 620, 654 [274 Cal.Rptr. 252, 798 P.2d 849] [§ 190.3, factors (d), (e), (f), (h) and (k)]; but see *People v. Proctor* (1992) 4 Cal.4th 499, 553 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [whether § 190.3, factor (j) can only be mitigating is undecided].)" (*People v. Wader, supra*, 5 Cal.4th at p. 657.) But the court's instruction was not to the contrary. It merely *limited* the jury's consideration of aggravation to the statutory factors. In accordance with our holding in *People v. Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], the court told the jury it could *not* consider in aggravation anything other than the statutory factors. It did not additionally tell the jury that all of the factors could be aggravating. Indeed, it said it had listed "a number of possible mitigating factors," and the jury "cannot consider the absence of any such factors in this case as an aggravating factor." Thus, the jury understood from the instruction that it could not consider in aggravation anything but the statutory factors. The reverse, however, does not follow.

The jury could not reasonably have understood the court to tell it that *all* of the factors could be aggravating. For example, it would be absurd for the jury to have supposed it could consider as *aggravating* that "the defendant reasonably believed [the circumstances of the crime] to be a moral justification or extenuation for his conduct." (§ 190.3, factor (f).)

The court did not define which of the statutory factors could be aggravating and which were only mitigating. It did not need to. The aggravating or mitigating nature of the factors is self-evident within the context of each case. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1268 [74 Cal.Rptr.2d 212, 954 P.2d 475].) "The trial court, being under no obligation to instruct the jury that factors (d) through (h) of section 190.3 could only be considered in mitigation of sentence, did not err in declining to do so." (*Ibid.*) In *People v. Wader, supra,* 5 Cal.4th at page 657, we found error, albeit invited, in instructing the jury that the 11 statutory factors "may be considered by you, if applicable, as either aggravating factors or mitigating factors." That instruction—telling the jury it *may* consider any of the statutory factors as aggravating—was quite different from the one here—which merely told the jury the statutory factors were the only ones it could consider in aggravation.

Moreover, even if the instructions could be considered ambiguous in this regard,[6] we see nothing in the record suggesting the jury was misled into believing it could consider as aggravating a factor that can only mitigate. The main force of defendant's contrary argument, based primarily on the prosecutor's argument to the jury, is that the jury may have erroneously considered as aggravating the evidence he presented of section 190.3, factors (d) ("mental or emotional disturbance") and (h) ("the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication"). We disagree. In her opening argument to the jury, the prosecutor discussed the statutory factors one by one. She argued the jury should give factor (d) "a big 0." Thus, she argued it was a nonfactor, not an aggravating factor. Similarly, in discussing factor (h), her entire thrust was to *minimize* this factor, not to use it in aggravation.

Defendant interprets the prosecutor's argument differently. He notes that at the outset, she argued that he was "simply too dangerous to live." Argument of dangerousness is proper when based, as here, on the defendant's past conduct. (*People v. Ray, supra,* 13 Cal.4th at pp. 352-353.) The prosecutor did not suggest that the evidence defendant presented of his

---

[6]To avoid any possible ambiguity in the future, we suggest that, on request, the court merely tell the jury it may not consider in aggravation anything other than the aggravating statutory factors.

mental state was itself aggravating. As defendant notes, the prosecutor did discuss this defense evidence; indeed, she discussed it extensively, as she probably had to given the emphasis the defense placed on it. We have reviewed that argument, including the excerpts defendant cites. The prosecutor argued that for many reasons the evidence regarding his mental state was not mitigating under the circumstances. But she did not argue the reverse— that the evidence was actually aggravating. In addition, as noted, the court instructed the jury that the *absence* of any mitigating evidence was not itself aggravating. Regarding another point that defendant cites, defense counsel argued to the jury that defendant was a "whipped puppy." In rebuttal, the prosecutor responded that he may once have been a "whipped puppy," but he was now a "mad dog." This response to the defense argument also did not suggest that defendant's mental state was itself aggravating. As she emphasized in her concluding comments, her main argument was that defendant's "conduct" warranted the death penalty. She did not argue that the evidence defendant presented of his mental condition itself warranted a death sentence, only that it did not warrant a life sentence.

In short, we see no reasonable likelihood the jury interpreted the instructions as allowing it to consider in aggravation the evidence defendant presented of his mental state. (*People v. Kelly, supra*, 1 Cal.4th at p. 525.)

### 3. *Miscellaneous Contentions*

Defendant reiterates various arguments that we have rejected. We see no reason to reconsider our previous decisions. The lying-in-wait special circumstance adequately distinguishes between first degree murders that are death eligible and those that are not. (*People v. Carpenter, supra*, 15 Cal.4th at p. 419; see also *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907-908 & fn. 2.) Consideration of both section 190.3, factors (b) (criminal activity involving force or violence), and (c) (prior felony convictions) is permissible. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1228-1229 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Section 190.2 is not impermissibly broad. (*People v. Frye, supra*, 18 Cal.4th at p. 1029.) Section 190.3, factor (a) (circumstances of the crime) is not impermissibly vague. (*People v. Medina* (1995) 11 Cal.4th 694, 780-781 [47 Cal.Rptr.2d 165, 906 P.2d 2].) The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt (1) that an aggravating circumstance exists (except for other crimes), (2) that the aggravating circumstances outweigh mitigating circumstances, or (3) that death is the appropriate penalty. (*People v. Carpenter, supra*, 15 Cal.4th at p. 421; *People v. Bradford* (1997) 14 Cal.4th 1005, 1059 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Except for other crimes evidence, the court need not instruct the jury

on the burden of proof at the penalty phase. (*People v. Carpenter, supra,* 15 Cal.4th at pp. 417-418.)

Neither intercase proportionality nor disparate sentence review is required. (*People v. Riel, supra,* 22 Cal.4th at p. 1223; *People v. Cox* (1991) 53 Cal.3d 618, 691 [280 Cal.Rptr. 692, 809 P.2d 351].) Defendant is, however, entitled to *intracase* proportionality review. (*People v. Riel, supra,* 22 Cal.4th at pp. 1223-1224.) He does not specifically request such review, but it would not aid him. Given the nature of the current crime and his previous criminal conduct, defendant's sentence is not disproportionate to his personal culpability. (*Id.* at p. 1224.)

### 4. *International Law*

Defendant contends his death sentence violates international law. He claims that the alleged errors, "which denied [him] a fair trial and constitutional penalty phase, also violated customary international law as informed by the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the American Declaration of the Rights and Duties of Man." As in *People v. Jenkins* (2000) 22 Cal.4th 900 [95 Cal.Rptr.2d 377, 997 P.2d 1044], we need not consider whether a violation of state or federal constitutional law would also violate international law, "because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law . . . ." (*Id.* at p. 1055.) Moreover, had defendant shown prejudicial error under domestic law, we would have set aside the judgment on that basis without recourse to international law.

Defendant also argues that "the death penalty, as applied in the United States and the State of California, violates customary international law as evidenced by the equal protection provisions of the above mentioned instruments as well as the International Convention Against All Forms of Racial Discrimination." He does not have to turn to international law for protection from racial discrimination. Both the state and federal Constitutions and various statutory provisions prohibit the state from engaging in racial discrimination. Defendant has not shown, under the state or federal Constitution or international law, that "his rights to due process of law and to be free from invidious discrimination on the basis of race have been violated." (*People v. Jenkins, supra,* 22 Cal.4th at p. 1055.) International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*Ibid.*; see also *People v. Ghent* (1987) 43 Cal.3d 739, 778-779 [239 Cal.Rptr. 82, 739 P.2d 1250] (maj. opn.); *id.* at pp. 780-781 (conc. opn. of Mosk, J.).)

## 5. *Effect of Partial Reversal*

We are reversing the kidnapping for robbery conviction and kidnapping-murder special circumstance. This partial reversal, however, does not require setting aside the death judgment. The jury properly considered all of the evidence. It was well aware of the circumstances of Schultz's murder. It would not have given significant independent weight to the kidnapping conviction itself rather than the overall circumstances of the capital crime and the aggravating and mitigating evidence. (*People v. Kelly, supra,* 1 Cal.4th at p. 551.) The question whether defendant dragged his victim to another location while he was dying or after he had already died, although critical to the kidnapping conviction, was of little significance to the penalty determination. The likelihood that defendant killed first, then dragged the victim, is hardly mitigating. We see no reasonable possibility the difference between the victim's dying before, during, or after the dragging affected the penalty determination. (*Ibid.*)

## III. CONCLUSION

We reverse the kidnapping for robbery conviction and the kidnapping-murder special circumstance and otherwise affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring.—Justice Moreno in his concurring and dissenting opinion disagrees with the majority that substantial evidence supports the lying-in-wait special circumstance. Although the evidence is not strong, I agree with the majority that it is sufficient to support this special circumstance. I reiterate a concern, however, that I expressed nearly a decade ago in a concurring and dissenting opinion in *People v. Ceja* (1993) 4 Cal.4th 1134, 1146 [17 Cal.Rptr.2d 375, 847 P.2d 55], where I said: "Recent decisions of this court have given expansive definitions to the term 'lying in wait,' while drawing little distinction between 'lying in wait' as a form of first degree murder and the lying-in-wait special circumstance, which subjects a defendant to the death penalty. [Citations.] Constrained by the principle of stare decisis, I concurred in the more recent of these decisions, which were reached after I joined this court. I have a growing concern, however, that these decisions may have undermined the critical narrowing function of the lying-in-wait special circumstance: to separate defendants whose acts warrant the death penalty from those defendants who are 'merely' guilty of first degree murder." (*People v. Ceja, supra,* 4 Cal.4th at p. 1147 (conc. opn. of Kennard, J.).)

Because I agree with the majority that substantial evidence supports the lying-in-wait special circumstance, I need not here explore the differences between the special circumstance and lying in wait as a form of first degree murder.

**MORENO, J.,** Concurring and Dissenting.—I concur in the majority opinion, except that I would reverse the lying-in-wait special-circumstance finding, because it is not supported by substantial evidence.

"As construed by the United States Supreme Court, the Eighth Amendment requires that a death penalty law 'rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not' [citation], and establish 'rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold.' [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 697 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

In California, this narrowing function is performed by requiring a finding that the murder involved special circumstances before a defendant is eligible to receive the death penalty. (Pen. Code, § 190.2) "[T]he special circumstances serve to ' "guide" ' and ' "channel" ' jury discretion 'by strictly confining the class of offenders eligible for the death penalty.' [Citation.]" (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 467 [24 Cal.Rptr.2d 808, 862 P.2d 808].) In order to perform this constitutionally required function, a special circumstance finding "must genuinely narrow the class of persons eligible for the death penalty, and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." (*Zant v. Stephens* (1983) 462 U.S. 862, 877 [103 S.Ct. 2733, 2742, 77 L.Ed.2d 235].)

One special circumstance is that "[t]he defendant intentionally killed the victim by means of lying in wait." (Pen. Code, § 190.2, subd. (a)(15).) We held in *People v. Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244] that this lying-in-wait special circumstance could be established even if the defendant was not physically concealed before committing an intentional murder if the evidence showed "(1) concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*Id.* at p. 557.) In the present case, there was insufficient evidence of the third requirement, that there be a surprise attack on an unsuspecting victim from a position of advantage.

In *People v. Morales, supra*, 48 Cal.3d 527, the victim was in the front passenger seat of an automobile driven by the defendant's accomplice. The

defendant entered the backseat, directly behind the victim. After they had driven "to a more isolated location, defendant reached over the seat and attempted to strangle [the victim] with [a] belt." (*Id.* at p. 554.) When that failed, he hit her with a hammer. The victim's "cries for help from [the defendant's accomplice] indicated that she was taken by surprise . . . ." (*Ibid.*)

This court held there was sufficient evidence of lying in wait, despite the circumstance that the victim was aware of the defendant's presence prior to the attack, "based on defendant's watchful waiting, from a position of advantage in the backseat, while the car was driven to a more isolated area, and his sudden surprise attack, from behind and without warning . . . ." (*People v. Morales, supra,* 48 Cal.3d at p. 555.) We rejected the defendant's argument that lying in wait required physical concealment, but took care to explain that "a mere concealment of purpose" is not sufficient to establish lying in wait because "many 'routine' murders are accomplished by such means, and the constitutional considerations raised by defendant might well prevent treating the commission of such murders as a special circumstance justifying the death penalty." (*Id.* at p. 557.) Rather, as noted above, in addition to concealment of purpose and a substantial period of watching and waiting for an opportune time to act, we required "immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*Ibid.*)

The evidence in the present case does not satisfy the third prong of the *Morales* test. Defendant's brother and accomplice, Lonnie Hillhouse, testified that defendant stated he planned to rob and kill the victim, who was passed out on the front seat of the victim's truck. With defendant driving and Lonnie seated next to the victim, they drove out of Chico into a less populated area. At defendant's direction, Lonnie removed money from the victim's pockets and gave it to defendant. The victim woke up and, at his request, they turned around and headed back towards Chico. They pulled over at the victim's request, and Lonnie walked to the back of the truck. The victim walked a couple of feet from the truck and began urinating. Defendant approached the victim and said something that Lonnie could not quite hear. The victim responded: "Don't fuck with me while I'm peeing." Defendant, who was standing in front of the victim, said: "I ought to kill you." Lonnie then "heard a thunk" as defendant stabbed the victim in the chest. The victim began "gasping for air." Lonnie turned away, but looked back when he felt something hit the truck and saw the victim leaning against the door with his hands on his chest. Defendant grabbed the victim, threw him to the ground and stabbed him three more times.

It is undisputed that defendant concealed his purpose to kill the victim until he felt the circumstances were conducive to committing the crime, but

that is not enough to constitute lying in wait. If it were, most premeditated murders would involve lying in wait and this special circumstance would not perform its function of narrowing " 'the class of persons eligible for the death penalty' " and so "afford some objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not." (*People v. Bacigalupo, supra,* 6 Cal.4th 457, 465.) Moreover, mere advance planning or waiting for an opportune moment to attack the victim, without more, does not constitute lying in wait. The period of watchful waiting must result in the defendant achieving a position of advantage from which he or she can launch a surprise attack upon an unsuspecting victim.

In the present case, unlike in *Morales,* defendant did not surprise his unsuspecting victim from behind. Defendant approached the victim, spoke to him, and said that he ought to kill him, before he stabbed the victim in the chest. This evidence thus does not establish the third prong of the *Morales* test, i.e., "a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales, supra,* 48 Cal.3d 527, 557.)

Accordingly, I would reverse the lying-in-wait special-circumstance finding. In all other respects, I concur in the majority opinion.

Appellant's petition for a rehearing was denied May 15, 2002.