[No. A131764. First Dist., Div. Four. Mar. 28, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK KENNETH DAVIS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.D. and E.

1324

**COUNSEL**

Michelle May, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RIVERA, J.**—Defendant Jack Kenneth Davis appeals a judgment entered upon a jury verdict finding him guilty of possession of a deadly weapon,

specifically a billy (Pen. Code, former § 12020, subd. (a)),[1] and displaying false evidence of registration (Veh. Code, § 4462.5). The jury acquitted him of the charge of carrying a dirk or dagger. (§ 12020, subd. (a).) The trial court suspended imposition of sentence and placed defendant on probation for three years. On appeal, defendant challenges his weapon conviction on both statutory and constitutional grounds. We shall affirm the judgment.

## I. BACKGROUND

### A. *The Traffic Stop*

Defendant was driving his pickup truck in January 2010. A sheriff's deputy, Osvaldo Hernandez, stopped him for making an unsafe lane change. Although the truck had a current registration sticker, when Hernandez asked him for his registration, defendant told Hernandez that his registration had expired. A call to dispatch confirmed that the registration had indeed expired.

Hernandez asked defendant to step out of his truck and asked if he had any weapons on him. Defendant said he had a pocketknife. Hernandez found one knife clipped to the outside of defendant's right front pants pocket, which Hernandez understood to be lawful because it was not concealed, and a second knife inside defendant's vest. Hernandez asked defendant if he had any other weapons, and defendant said he had a bat in the backseat of his vehicle. Hernandez found the bat. A number of holes had been drilled partially through the handle, and it had a leather wrist strap. Hernandez believed the holes would make the bat lighter or make it easier to grip it. The bat had been painted black, and in two separate places had two red lightning bolts drawn on it. Hernandez asked defendant why he had the bat, and defendant said he repossessed vehicles late at night and needed the bat for protection. Hernandez also found some tools in defendant's vehicle, which had red "SS" lightning bolts imprinted on them. Defendant told Hernandez he was an electrician and used the lightning bolts to mark his tools.

Hernandez testified that double lightning bolt markings were used by neo-Nazi White supremacist groups and skinheads. Hernandez was part of the

---

[1] All undesignated statutory references are to the Penal Code. Effective January 1, 2012, section 12020 was repealed (Stats. 2010, ch. 711, § 4) and the pertinent portions were reenacted without substantive change in section 22210. For the sake of convenience, further references will be to the statute in effect at the time of defendant's conviction, without the use of the term "former."

Section 12020 provided in pertinent part: "(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison: [¶] (1) . . . [P]ossesses . . . any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag. [¶] . . . [¶] [or] (4) Carries concealed upon his or her person any dirk or dagger."

gang task force, and had been informed that members of these types of groups could be violent and might have weapons with them. Hernandez believed the bat was being carried for use as a weapon. When asked if he considered the bat a billy, he testified, "Yes, I would classify it as a modified baseball bat, billy club."

### B. *Prior Conviction*

In 1996, during a search of defendant's residence, police officers found and seized a black billy club from his bedroom. At the time, defendant admitted the billy club belonged to him. An officer told him it was illegal to have the billy club. Defendant was convicted of possessing the billy club. In her testimony at trial in this case, an officer who was involved in the 1996 search testified that if she had found the bat at issue in this case, she would have considered it a billy and confiscated it.

### C. *Defense and Rebuttal*

A friend of defendant's testified in his defense that defendant used the bat to play with a dog at the friend's automotive shop. The friend testified that the lightning bolts were defendant's "trademark," which he used to mark all his tools to prevent other people from taking them. Defendant's longtime girlfriend and his stepdaughter testified that defendant put the lightning bolt symbol on his tools and that they did not know defendant to be a skinhead or a member of a neo-Nazi or White supremacist group. His girlfriend also testified that defendant kept the bat in the back of his truck and that he used it to play with a dog.

Defendant testified that he supplemented his income by repossessing vehicles for a finance company. In the course of his work, he had "been shot at, [had] had baseball bats swung at [him], [had] been hit in the face by girls, [had] been kicked, punched . . . ." He testified that when Hernandez stopped him and asked him about weapons, he forgot to mention the knife in his vest, but that it was not concealed. When Hernandez asked if there were other weapons in the truck, defendant mentioned the baseball bat as a "common courtesy." He said that when he painted the bat and put holes in the handle, he was "just screwing around," and that he put lightning bolt signs and drilled holes in the hammers in his toolbox to identify them and help him get a better grip. The strap allowed him to walk with the bat hanging from his wrist. He said he had never hit anyone with the bat or pulled it out, but that it was a "security blanket," and he wanted to have it available in case he was threatened during a repossession. He primarily used the bat to play with dogs. He also said he did not belong to any skinhead or Nazi organization. He testified that the billy club he had possessed in 1996 was a standard police nightstick. He admitted placing a false registration sticker on his truck.

In rebuttal, Hernandez testified that the bat looked as if had not been used much.

## II. DISCUSSION

### A. *Was the Bat a Billy?*

Defendant contends the weapon in question, a modified baseball bat, does not qualify as a billy for purposes of section 12020, subdivision (a)(1). In pertinent part, section 12020, subdivision (a) prohibited possession of "any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sap, or sandbag." Defendant contends we should resolve this issue based on the meaning of the term "billy" in 1923, when an uncodified predecessor statute was enacted. (Stats. 1923, ch. 339, § 1, p. 696; *People v. King* (2006) 38 Cal.4th 617, 623–624 [42 Cal.Rptr.3d 743, 133 P.3d 636] (*King*); see *San Joaquin etc. Irr. Co. v. Stevinson* (1912) 164 Cal. 221, 234 [128 P. 924] [meaning and effect of earlier statute not changed by putting it into the code].) Accordingly, he draws our attention to various sources from that time period that defined "billy" as a small metal bludgeon and defined "bludgeon" as a "short stick with one end loaded." According to defendant, the 1923 definitions restricted a billy or bludgeon to weapons that were short, small, and could easily be concealed upon the person.

We are guided in our inquiry by the rules California courts have laid down since 1923 in construing this statute. Under California law, an object with innocent uses may fall within the terms of section 12020, subdivision (a)(1) if the prosecution proves "that the object was possessed *as a weapon*. The only way to meet that burden is by evidence 'indicat[ing] that the possessor *would use* the object for a dangerous, not harmless, purpose.' [Citation.] The evidence may be circumstantial, and may be rebutted by the defendant with evidence of 'innocent usage.' " (*People v. Fannin* (2001) 91 Cal.App.4th 1399, 1404 [111 Cal.Rptr.2d 496]; see *id.* at p. 1406 [ordinary bicycle lock could be "slungshot" for purposes of § 12020, subd. (a)(1)].) As explained in *King, supra,* 38 Cal.4th at page 624, "an item commonly used for a nonviolent purpose, *such as a baseball bat or a table leg*, could qualify as a billy, but only 'when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicated that the possessor would use the object for a dangerous, not harmless, purpose.' " (Italics added.)

Our Supreme Court in *People v. Grubb* (1965) 63 Cal.2d 614, 616, 621 [47 Cal.Rptr. 772, 408 P.2d 100] (*Grubb*), considered whether a baseball bat from which the handle had been broken could be considered a billy. The court "h[e]ld that the statute embraces instruments other than those specially

created or manufactured for criminal purposes; it specifically includes those objects 'of the *kind* commonly known as a billy.' [Citation.] . . . The Legislature thus decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger. Accordingly the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a 'tough' neighborhood to the scene of a riot. On the other hand the section would not penalize the Little Leaguer at bat in a baseball game." (*Id.* at p. 621.) The court concluded that in the circumstances of that case, "the possession of [an] altered baseball bat, taped at the smaller end, heavier at the unbroken end, carried about in the car, obviously usable as a 'billy,' clearly not transported for the purpose of playing baseball, violates the statute." (*Ibid.*)

■ Defendant contends this language in *Grubb* was dictum and hence not binding on us, because the court there had already concluded the defendant's conviction must be reversed because of the erroneous admission of evidence. (*Grubb, supra,* 63 Cal.2d at pp. 615–618.) But the court's conclusion that section 12020 included an object " 'of the *kind* commonly known as a billy' " was expressly described as its holding, and was immediately followed by the discussion, quoted above, explaining that a table leg or an altered bat could be considered a billy. (*Grubb, supra,* 63 Cal.2d at p. 621.) The high court relied on this discussion in *King, supra,* 38 Cal.4th at page 624. In the circumstances, we consider ourselves bound by *Grubb.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In any case, even if the discussion was arguably dictum, we would follow it: "When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed." (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [78 Cal.Rptr.2d 819].)

■ We have examined both the record and the bat itself, and conclude that under the facts and the applicable law, the jury could reasonably find the bat was a billy for purposes of section 12020. Defendant is correct that the bat at issue in *Grubb* was described as a small bat; according to the opinion, it was 20 inches long. (*Grubb, supra,* 63 Cal.2d at p. 616.) The bat found in defendant's truck is somewhat longer, approximately 29 inches long. The bat's size is not dispositive, however, under the rule announced in *Grubb* and discussed in *King.* In both cases, the high court stated that in appropriate circumstances, both a bat and a table leg could be billies. (*Grubb, supra,* 63 Cal.2d at p. 621; *King, supra,* 38 Cal.4th at p. 624; see *People v. Canales* (1936) 12 Cal.App.2d 215, 218 [55 P.2d 289] [item need not be concealable to be blackjack or billy].) Here, the bat had been modified in a way the jury could reasonably conclude made it more useful as a weapon: the holes in its handle could reasonably be seen to make it easier to grip, and the strap could

make it easier to carry and to swing. Moreover, defendant admitted to Hernandez at the time of his arrest that he needed the bat for protection—i.e., as a weapon. On this record, the jury could properly conclude the bat was a billy.

### B.  *Instruction on Billy*

The jury was instructed pursuant to CALCRIM No. 2500 as follows: "The defendant is charged in Count Two with unlawfully possessing a weapon, specifically a billy. To prove the defendant is guilty of this crime the People must prove that, one, the defendant possessed a billy; and, two, the defendant knew he possessed the billy; and, three, the defendant possessed the object as a weapon. [¶] When deciding whether the defendant possessed the object as a weapon, consider all the surrounding circumstances relating to that question, including when and where the object was possessed, whether the object was changed from its standard form, and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose. . . ." This instruction does not define the term "billy."

In a variant on the previous argument, defendant contends the trial court erred in not instructing the jury on the physical characteristics of a billy, and particularly in not instructing that a billy must be short or small. (See *People v. Blair* (2005) 36 Cal.4th 686, 744 [31 Cal.Rptr.3d 485, 115 P.3d 1145] [trial court must instruct jury sua sponte on general principles of law relevant to evidence]; see also *People v. Miller* (1999) 69 Cal.App.4th 190, 207 [81 Cal.Rptr.2d 410] [trial court has sua sponte duty to give explanatory instruction when terms in instruction have technical meaning peculiar to the law].) We reject this argument for two reasons. First, defendant waived it. The prosecutor originally proposed adding to the instruction the sentence: "A billy means a short stick or club, a bludgeon." A colloquy ensued in which the trial court, the prosecutor, and defense counsel discussed the propriety of including this or another definition of the term "billy." Defense counsel first pointed out that the term "bludgeon" had a dictionary definition of a short stick, with one thick or loaded end, used as a weapon. The court noted that under *Grubb*, an altered bat could be considered "something commonly known as a billy." Defense counsel objected to the definition proposed by the prosecutor unless the court also gave a definition of bludgeon. The prosecutor suggested that they come up with an alternative definition of "billy," and the court asked if defense counsel objected to defining a billy as "a short stick or club." After further discussion of how to define the term "bludgeon," the court noted that *Grubb* did not define the term "billy," and suggested the bat might qualify as a bludgeon "if we included a definition of a short stick which usually has one thick or loaded end and is used as a weapon." Defense counsel then stated, "You know, I think we're better off eliminating [the prosecutor's proposed

definition] at all entirely and giving the definition that the CALCRIM people suggest and letting the jury decide." The prosecutor agreed to eliminate the proposed definition, and the jury was instructed with the CALCRIM language, which does not include a definition of the term "billy."

From this colloquy, it is clear that the trial court suggested using the word "short" in defining both "billy" and "bludgeon," and that defense counsel rejected the suggestion and requested the unadorned CALCRIM instruction. Moreover, counsel may well have had a strategic reason to do so: in his closing argument, he suggested to the jury that a billy was a billy club of the type used by law enforcement—something the bat manifestly was not. A definition of a billy as a short stick or bludgeon might have dampened the force of this argument. In the circumstances, any error in not defining a billy as a short or small object was invited. (See *People v. Cooper* (1991) 53 Cal.3d 771, 831 [281 Cal.Rptr. 90, 809 P.2d 865] [for invited error, record must show counsel made "conscious tactical choice" between having and not having instruction]; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 [117 Cal.Rptr.2d 45, 40 P.3d 754] [party may not argue on appeal that instruction correct in law was incomplete, and thus needed clarification, without first requesting such clarification at trial].)

■ In any case, we find no error in instructing the jury pursuant to CALCRIM No. 2500 without adding a definition of a billy as a short or small object. Expert testimony may be admitted on the question of whether an object falls within the definition of a prohibited object. (*People v. Deane* (1968) 259 Cal.App.2d 82, 89 [66 Cal.Rptr. 177].) In this case, two police officers testified that the bat, as modified, was a billy. Moreover, as we have discussed, our Supreme Court has made clear that a baseball bat in appropriate circumstances—particularly a modified bat—may be a billy. (*Grubb, supra*, 63 Cal.2d at p. 621; *King, supra*, 38 Cal.4th at p. 624.) In the circumstances, no additional definition was necessary.

### C.  *Second Amendment*

Defendant contends that "if section 12020 subdivision (a)(1) is construed to prohibit his full-sized baseball bat as a wholly banned 'billy,' it would violate the Second Amendment under [*District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637, 128 S.Ct. 2783]]," held applicable to the states in *McDonald v. Chicago* (2010) 561 U.S. ___ [177 L.Ed.2d 894, 130 S.Ct. 3020].

The Attorney General contends defendant forfeited this issue by failing to raise it below. As defendant points out, he challenged his conviction on Second Amendment grounds below, in a motion for new trial. Even assuming

this posttrial motion was not sufficient to preserve the issue, however, we would exercise our discretion to consider it. The issue is one of law, which "requires the review of abstract and generalized legal concepts—a task that is suited to the role of an appellate court." (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310 [86 Cal.Rptr.3d 674].) Moreover, considering the issue now may avert a claim of ineffective assistance of counsel. (*Ibid.*)

█ In *Heller*, the high court concluded that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms . . ." (*District of Columbia v. Heller, supra*, 554 U.S. at p. 582 (*Heller*)), including "those [weapons] 'in common use at the time' " the Second Amendment was enacted (554 U.S. at p. 627). However, the court recognized that certain regulations—such as laws prohibiting possession of firearms by felons and the mentally ill, forbidding the carrying of firearms in sensitive places, and imposing conditions on the commercial sale of arms—were "presumptively lawful." (*Id.* at pp. 626–627 & fn. 26.) The court also explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (*Id.* at p. 625.)

We are not aware of any decision from a California court considering whether a ban on possession of a billy passes constitutional muster under *Heller*. The Attorney General argues that because a billy is not the sort of weapon "typically possessed by law-abiding citizens for lawful purposes," it falls outside Second Amendment protections. This argument is supported by the California Supreme Court's discussion in *Grubb*, which stated that in enacting section 12020, "[t]he Legislature obviously sought to condemn weapons common to the criminal's arsenal; it meant as well 'to outlaw instruments which are ordinarily used for criminal and unlawful purposes.' [Citations.]" (*Grubb, supra*, 63 Cal.2d at p. 620.) Similarly, in *People v. Mulherin* (1934) 140 Cal.App. 212, 215 [35 P.2d 174] (*Mulherin*), the court concluded that in prohibiting possession of instruments or weapons of the kind commonly known as blackjacks or billies, the Legislature's purpose "undoubtedly was to outlaw *instruments which are ordinarily used 'for criminal and improper purposes'* [citations], and so we have in this act 'a partial inventory of the arsenal of the "public enemy", the "gangster" ' [citation], and a prohibition against owning anything 'of the kind'." (Italics added; see *People v. Satchell* (1971) 6 Cal.3d 28, 41–42 [98 Cal.Rptr. 33, 489 P.2d 1361], overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 484, 490 & fn. 12 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

Defendant argues, however, that the modified bat at issue here was nothing but a long club, an instrument of the sort traditionally used by law-abiding citizens for lawful defensive purposes, and therefore defendant had a right to

its possession under the Second Amendment. For his argument, defendant relies heavily on a case interpreting the Oregon Constitution in connection with a statute that prohibited possession of a billy. (*State v. Kessler* (1980) 289 Or. 359 [614 P.2d 94] (*Kessler*).)

In *Kessler*, the police found two billy clubs in the defendant's home at the time of his arrest. The Oregon Constitution provides: "The people shall have the right to bear arms for the defence of themselves, and the State, but the Military shall be kept in strict subordination to the civil power." (Or. Const., art. I, § 27; see *Kessler, supra*, 614 P.2d at p. 95.) The statute in question prohibited possession of " 'an instrument or weapon commonly known as a blackjack, slung shot, billy, sandclub, sandbag, sap glove or metal knuckles . . . .' " (*Id.* at fn. 1.) The court noted that decisions construing the Second Amendment to the United States Constitution were "not particularly helpful because the wording of the [S]econd [A]mendment differs substantially from [Oregon's] state provision." (614 P.2d at p. 95.) The court then reviewed the history of the state's guarantee of the right to bear arms, and agreed with the defendant's contention that his conviction for possession of a billy club violated "his right to possess arms *in his home* for personal defense," concluding that the drafters of the Oregon constitutional provision intended " 'arms' " to include the hand-carried weapons commonly used by individuals for personal defense, that clubs were still used as personal weapons, and that therefore the "defendant's possession of a billy club in his home is protected by . . . the Oregon Constitution." (*Id.* at pp. 95–100, italics added.)

We need not determine whether the statute is unconstitutional to the extent it prohibits possession of certain weapons *in the home.* Here, defendant did not possess the modified bat in his home, but was carrying it in his car. The constitutional right to carry weapons outside the home was not addressed in *Kessler* nor, indeed, by *Heller*, which narrowly held that the District of Columbia's ban on "possession [of lawful weapons] *in the home* violates the Second Amendment . . . ." (*Heller, supra*, 554 U.S. at p. 635, italics added.) We note, as well, the restriction contained in Section 12020 did not deprive persons of their ability to defend themselves or their homes, because there are alternative means to do so. (See *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1350–1351 [128 Cal.Rptr.3d 245] [statute prohibiting carrying concealed weapon in vehicle did not impair ability to defend " 'hearth or home' " because it did not prohibit possession of loaded firearm in home; it did not prohibit carrying firearm for self-defense because it exempted carrying concealable firearm with permit and carrying firearm in locked container].)

As we have explained, California courts have concluded that in enacting section 12020, the Legislature intended to outlaw instruments normally used for criminal purposes. (*Grubb, supra*, 63 Cal.2d at p. 620; *Mulherin, supra*,

140 Cal.App. at p. 215.) The high court has stated that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." (*Heller, supra,* 554 U.S. at p. 625.) It is for the Legislature to decide what weapons meet that definition, and this court "must uphold the statute unless its unconstitutionality plainly and unmistakably appears." (*People v. Black* (2003) 114 Cal.App.4th 830, 833 [7 Cal.Rptr.3d 902].)[2]

In this day and age, as we are all painfully aware, it is often a gun—not a billy, sap, or blackjack—that is the weapon of choice in most violent crimes.[3] That fact, however, does not negate the Legislature's determination that the kind of weapons known as billies, blackjacks, and saps are also instruments which are " 'ordinarily used for criminal and unlawful purposes' " (*Grubb, supra,* 63 Cal.2d at p. 620) and defendant has not demonstrated otherwise.[4]

This conclusion disposes not only of defendant's arguments that possession of a billy in general, or of the specific instrument in question in this case, could not be criminalized consistent with the Second Amendment, but also that the trial court erred in failing to instruct the jury on the legal principles of *Heller* and the Second Amendment. Since a billy falls outside the protection of the Second Amendment, the court had no obligation to instruct the jury on those principles.

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[2] The Seventh Circuit Court of Appeals recently held that the Second Amendment right to bear arms includes a right to carry a loaded gun outside the home. (*Moore v. Madigan* (7th Cir. 2012) 702 F.3d 933.) Even assuming Second Amendment protections extend outside the home, we would find no constitutional violation here, where there are alternative means of self-defense and where the Legislature has concluded that the type of weapon at issue is normally used for criminal purposes.

[3] According to the FBI's uniform crime report, in 2009, 67.1 percent of homicides, 20.9 percent of aggravated assaults, and 42.6 percent of robberies were committed with guns. (<http://www2.fbi.gov/ucr/cius2009/offenses/violent_crime/index.html> [as of Mar. 28, 2013].)

[4] Because we reach this conclusion, we need not apply constitutional "means-end" scrutiny that balances the objectives of the statute against the means used to accomplish those ends, or decide the proper level of constitutional scrutiny to apply if the weapon in question *did* fall within the protection of the Second Amendment. (*People v. Delacey* (2011) 192 Cal.App.4th 1481, 1489–1492 [122 Cal.Rptr.3d 216] [where arms restriction fell within *Heller*'s ' "presumptively lawful' " language it was immune from means-end scrutiny].)

*See footnote, *ante*, page 1322.

## III. DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied April 29, 2013, and respondent's petition for review by the Supreme Court was denied July 17, 2013, S210601.