Filed 1/16/14  P. v. Standen CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSHUA MICHAEL STANDEN,<br><br>    Defendant and Appellant. | F064896<br><br>(Super. Ct. No. CRF36866)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Eric L. DuTemple, Judge.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Joshua Michael Standen of cultivating marijuana (Health & Saf. Code, § 11358)[1] and possession of a billy club (Pen. Code, § 22210). He contends the trial court improperly instructed the jury and abused its discretion when it denied his motion to reduce the Penal Code violation to a misdemeanor. He also argues his possession of the billy club was protected by the Second Amendment to the United States Constitution. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

Tuolumne County Sheriff's Department Detective Robert Steven Nikiforuk was the prosecution's only witness. On the day in question, Nikiforuk and two other officers served a search warrant at Standen's residence. Adrian Vasquez and Tara Romano also lived at the residence. Vasquez and Standen took Nikiforuk to view nine marijuana plants in the backyard. Standen stated they were growing 12 plants per person, perhaps 30 plants total.

Nikiforuk and Standen next went inside the shed where Standen kept an indoor cultivation site. Nikiforuk located 31 immature marijuana plants ranging in size from two inches to four feet tall. Nikiforuk also found a jar in Standen's room that appeared to contain about 34 grams of marijuana. Nikiforuk found eight more marijuana plants in the garage. Later, Nikiforuk found 43 more small marijuana plants in the shed in the early stages of growth. The total number of plants found at the property was 91. Five mason jars containing two-thirds of a pound of marijuana were found in Standen's bedroom. Some concentrated cannabis was found on a plate in the shed. Marijuana butter was found in the freezer. A digital scale was found in Vasquez's room. Bags that could be used for packaging were found in the living room.

---

[1]All statutory references are to the Health and Safety Code unless otherwise stated.

Standen, Vasquez, and Romano each appeared to have a valid marijuana recommendation from a doctor. Standen stated the marijuana plants belonged to Vasquez, Romano, and him. Standen also stated he would share his marijuana with other friends who also had valid medical marijuana cards.

Standen admitted he consumed up to five or six grams of marijuana a day during the harvest period. On normal days he would consume one to 1.5 grams per day. Standen admitted he attempted to sell some of his marijuana to collectives but had not been successful. He also stated he intended to bury some of the marijuana and retrieve it when the market was better. Finally, Standen admitted he had a billy club under the bed in his bedroom.

In Nikiforuk's opinion, a typical marijuana cigarette contained from .5 grams to 1.0 grams of marijuana. The effect of one marijuana cigarette typically would last from four to six hours. Nikiforuk opined the marijuana was possessed for the purpose of sale. He based this opinion on the number of plants found at the residence, the amount of marijuana used by Standen in a year, the potential yield from the plants, the act of attempting to sell marijuana to the collectives, Standen's admission he was going to bury marijuana and sell it later in the year, and the scale and packaging material found in the house.

Standen testified he has had a "recommendation" since he was 20 years old, referring to a medical marijuana recommendation. Initially, he purchased marijuana, but he eventually learned how to grow his own. His first marijuana harvest occurred in 2011. Standen claimed partial ownership in two of the marijuana plants that were growing outdoors and full ownership in one-third of the other plants. He estimated that only 20 percent of the young plants in the shed would grow to maturity. Standen's intention was to grow the marijuana and place it in jars. He intended to use the marijuana for his personal needs and not sell it. He admitted talking to two collectives but denied ever

trying to sell marijuana to either of them. He admitted providing some marijuana to friends who had a prescription and could not afford to purchase any marijuana.

The marijuana found in jars in Standen's room recently had been harvested from the outdoor plants. He intended to use this for his personal needs. He believed he would not have enough marijuana from all of the plants to meet his personal needs. He talked with Nikiforuk about what would happen if he had too much and stated he would bury some and retrieve it when the value for him was high or when he needed it for personal consumption.

Standen claimed the billy club belonged to his grandfather, and he had received it as a memento when his grandfather died. He intended to mount it in a frame but had not gotten around to it. The billy club was used by his grandfather in the 1940's when he was a policeman.

Standen stated he did not have access to the bedroom shared by Romano and Vasquez, which had a lock on the door, nor did he know why Vasquez possessed the digital scale.

Standen was charged with cultivating marijuana (§ 11358), possession of marijuana for sale (§ 11359), and possession of a deadly weapon (Pen. Code, § 22210). The jury found him guilty of cultivating marijuana and possession of a deadly weapon, but found him not guilty of possession of marijuana for sale. Imposition of the sentence was suspended and Standen was placed on five years' probation, including six months in the county jail.

## DISCUSSION

### CALCRIM No. 2370

The relevant portion of section 11362.5, the Compassionate Use Act of 1996 (CUA), provides that a patient who has written approval of a physician and cultivates marijuana for the patient's personal medical purposes cannot be convicted of cultivating

marijuana, in violation of section 11358.  (§ 11362.5, subd. (d).)[2]  Standen relied on this section to claim his cultivation was lawful.

The trial court instructed the jury with CALCRIM No. 2370 to provide the jury with the law related to the CUA defense.  The relevant portion of the instruction stated:

> "Possession or cultivation of marijuana is lawful if authorized by the Compassionate Use Act.  The Compassionate Use Act allows a person to possess or cultivate marijuana for personal medical purposes or as the primary caregiver of a patient with a medical need when a physician has recommended or approved such use.  *The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs*.  The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes.  If the People have not met the burden, you must find the defendant not guilty."  (Italics added.)

Standen argues this instruction erroneously stated the law because section 11362.5, subdivision (d) permits a defendant is his position to cultivate marijuana "for the personal medical purposes of the patient," while the instruction imposed the requirement that the amount cultivated "must be reasonably related to the patient's current medical needs."

The phrase "reasonably related to the patient's current medical needs" appears to have originated in *People v. Trippett* (1997) 56 Cal.App.4th 1532, 1549 (*Trippett*), one of the first cases to interpret the CUA.  Trippett was arrested after officers found two pounds of marijuana in her vehicle.  The trial court precluded her from presenting a defense based on medical necessity, concluding she could not establish the elements of the

---

[2]Section 11362.5, subdivision (d) states in full:  "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."

defense. Trippett was convicted of possession of marijuana and transportation of marijuana.

The CUA was passed while the case was pending in the appellate court. The parties briefed the effect the new law had on the case, and the appellate court discussed the CUA extensively, including the history and arguments in support of and against the proposition. The appellate court rejected Trippett's argument that the CUA placed no limits on the amount of marijuana a person may possess, so long as it was possessed for the patient's personal medical needs. "To hold as she effectively urges would be tantamount to suggesting that the proposition's drafters and proponents were cynically trying to 'put one over' on the voters and that the latter were not perceptive enough to discern as much." (*Trippett, supra,* 56 Cal.App.4th at p. 1546.)

After concluding the matter was to be remanded to the trial court to permit Trippett the opportunity to present a CUA defense to the charges, the appellate court confirmed that it was "not remotely suggesting that, even with a physician's 'recommendation or approval,' a patient may possess an unlimited quantity of marijuana. The ballot arguments of the proponents, some of which are quoted above, are simply inconsistent with the proposition that either the patient or the primary caregiver may accumulate indefinite quantities of the drug. The statute certainly does not mean, for example, that a person who claims an occasional problem with arthritis pain may stockpile 100 pounds of marijuana just in case it suddenly gets cold. The rule should be that the quantity possessed by the patient or the primary caregiver, and the form and manner in which it is possessed, should be reasonably related to the patient's current medical needs. What precisely are the 'patient's current medical needs' must, of course, remain a factual question to be determined by the trier of fact." (*Trippett, supra,* 56 Cal.App.4th at p. 1549.)

Other appellate courts that have considered the issue have agreed with this statement in *Trippett*. (*People v. Wayman* (2010) 189 Cal.App.4th 215, 223

6.

[transportation of marijuana must be reasonably related to patient's medical needs]; *People v. Windus* (2008) 165 Cal.App.4th 634, 643 [possession of one and one-half pounds of marijuana may fall within the CUA if defendant could prove amount was reasonably related to current medical needs]; *People v. Frazier* (2005) 128 Cal.App.4th 807, 824-825 [rejecting challenge to reasonably related language in jury instruction].) We have not found any published case, and the parties do not cite one, that reaches a different conclusion.

Not only have the appellate courts unanimously concurred with *Trippett* on this issue, but the Supreme Court has also, although not holding so directly. The Supreme Court has considered the CUA, and the related Medical Marijuana Program (MMP), in three relevant cases. In *People v. Mower* (2002) 28 Cal.4th 457, the Supreme Court cited *Trippett* with approval, although not addressing the "reasonably related" language. In *People v. Wright* (2006) 40 Cal.4th 81 (*Wright*), however, this language was mentioned if not directly addressed. *Wright* addressed the application of the MMP to cases in which a CUA defense was proposed or offered. The original issue for which review was granted was related to transportation of marijuana reasonably related to a CUA patient's reasonable medical needs. At the time there was a split of authority in the Courts of Appeal whether the CUA provided a defense to transportation charges since, by its terms, the defense was limited to cultivation and possession.

While the case was pending in the Supreme Court, the MMP was passed, which authorized transportation of marijuana in certain circumstances, rendering moot the conflict in the Courts of Appeal. In a footnote, the Supreme Court stated, "As both sides acknowledged at argument, however, *Trippett*'s test for whether the defense applies in a particular case survived the enactment of the MMP and remains a useful analytic tool to the extent it is consistent with the statute." (*Wright, supra,* 40 Cal.4th at p. 92, fn. 7.) The *Trippett* test referred to the discussion in *Trippett* when the appellate court concluded that application of the CUA defense depended on whether the "'quantity transported and

7.

the method, timing and distance of the transportation are reasonably related to the patient's current medical needs.'" (*Wright,* at p. 92; *Trippett, supra,* 56 Cal.App.4th at p. 1551.)

*People v. Kelly* (2010) 47 Cal.4th 1008 addressed the issue of whether portions of the MMP impermissibly amended portions of the CUA. The MMP was an attempt by the Legislature to codify some of the uncertainty created by the CUA and the cases that interpreted the CUA. The MMP did not directly amend the CUA, but "add[ed] 18 new code sections that address[ed] the general subject matter covered by the CUA." (*Kelly,* at p. 1014.) The MMP established quantity limitations for possession and cultivation of marijuana for medical uses and contained a safe harbor provision that authorized possession of specific amounts of medical marijuana. (*Kelly,* at p. 1015.) Before resolving the issues presented, the Supreme Court discussed the relevant differences between the CUA and MMP:

> "As alluded to above and further explained below, subdivision (a) of section 11362.77, by its terms, does not confine its specific quantity limitations to those persons who voluntarily register with the program and obtain identification cards that protect them against arrest. It also restricts individuals who are entitled, under the CUA, to possess or cultivate any quantity of marijuana *reasonably necessary for their current medical needs*, thereby burdening a defense that might otherwise be advanced by persons protected by the CUA. Moreover, although subdivision (b) of section 11362.77 allows *possession* of a quantity 'consistent with the patient's needs' that is greater than the amount set out in subdivision (a), it affords this protection only if a physician so recommends—a qualification not found in the CUA." (*Kelly,* at p. 1017, first italics added.)

While the Supreme Court did not hold the CUA limited possession of marijuana to the amount that reasonably was related to the patient's current medical needs, we find this comment compelling. Moreover, we agree with the appellate courts that have addressed the issue and conclude that the CUA only permits possession or cultivation of marijuana that is reasonably related to the patient's current medical needs. Indeed, without such a limitation, the limited purpose of the act would be violated by permitting

anyone who obtained a recommendation to stockpile unlimited amounts of marijuana without fear of conviction. Accordingly, we conclude the jury here was properly instructed.

**Possession of the Billy Club**

The jury convicted Standen of violating Penal Code section 22210, possession of a billy club. He admitted possessing the billy club but challenges the conviction on the ground that the statute violates his Second Amendment right to bear arms. We reject his argument on both procedural grounds and substantive grounds.

Standen failed to raise this objection in the trial court. Hence, he has forfeited the argument. (*People v. Partida* (2005) 37 Cal.4th 428, 433-435.)

Even if we were we to consider the argument on the merits, we would reject it. Standen primarily relies on *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*). The issue in *Heller* was the District of Columbia's total ban on handguns. The opinion first interpreted the Second Amendment to guarantee the individual right to possess and carry weapons in case of confrontation. (*Heller,* at p. 592.) The Second Amendment was found applicable to all weapons that constitute bearable arms, even those that were not in existence at the time the Constitution was written. (*Heller,* at p. 582.) Further, the Supreme Court confirmed the right of every individual to bear arms for defensive purposes. (*Id.* at pp. 583, 602.) This right was not interpreted to be without limitation, however. (*Id.* at p. 595.)

> "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. [Citations.] For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. [Citations]. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

"We also recognize another important limitation on the right to keep and carry arms. [*United States v*.] *Miller* [(1939) 307 U.S. 174] said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' [Citation.] We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' [Citations.]" (*Heller, supra,* 554 U.S. at pp. 626-627, fn. omitted.)

The opinion explained that *Miller* held "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (*Heller, supra,* 554 U.S. at p. 625.)

The question, as we see it, is whether a billy club is a dangerous and unusual weapon, which is not typically carried by law-abiding citizens and thus is not protected by the Second Amendment.

This issue recently was addressed in *People v. Davis* (2013) 214 Cal.App.4th 1322. Finding support in *People v. Grubb* (1966) 63 Cal.2d 614, 620-621 [held legislative intent was to outlaw instruments ordinarily used for criminal and unlawful purposes when interpreting predecessor to Pen. Code § 22210] and *People v. Mulherin* (1934) 140 Cal.App. 212, 215 [purpose of predecessor statute was to outlaw weapons ordinarily used for criminal and unlawful purposes], the appellate court concluded that billy clubs ordinarily were used for criminal and unlawful purposes and thus were not protected by the Second Amendment. (*Davis,* at p. 1333.) "In this day and age, as we are all painfully aware, it is often a gun—not a billy, sap, or blackjack—that is the weapon of choice in most violent crimes. That fact, however, does not negate the Legislature's determination that the kind of weapons known as billies, blackjacks, and saps are also instruments which are '"ordinarily used for criminal and unlawful purposes"' [citation] and defendant has not demonstrated otherwise." (*Id.,* fn. omitted.)

We agree with this well-reasoned opinion and do not feel it necessary to repeat its detailed analysis. Accordingly, we hold the statute does not violate the Second Amendment.

**Penal Code Section 17, Subdivison (b) Motion**

Violation of Penal Code section 22210 may be punished as either a felony or a misdemeanor, a crime commonly known as a wobbler offense. (*People v. Park* (2013) 56 Cal.4th 782, 789 (*Park*).)

Here, the crime was charged as a felony. Standen, however, moved to have the conviction reduced to a misdemeanor pursuant to Penal Code section 17, subdivision (b). The trial court denied the motion and deemed the conviction to be a felony. Standen argues that trial court erred.

A trial court has discretion to reduce a conviction to a misdemeanor. (*Park, supra,* 56 Cal.4th at p. 790.) "As a general matter, the court's exercise of discretion under [Penal Code] section 17(b) contemplates the imposition of misdemeanor punishment for a wobbler 'in those cases in which the rehabilitation of the convicted defendant either does not require, or would be adversely affected by, incarceration in a state prison as a felon.' [Citation.] The court's authority to exercise discretion in this regard is a long-established component of California's criminal law." (*Ibid*.) We review the trial court's decision for an abuse of discretion. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 976-977 (*Alvarez*).)

The canons governing the trial court in the exercise of its discretion are well established:

> "'This discretion … is neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice. [Citations.]' [Citation.] 'Obviously the term is a broad and elastic one [citation] which we have equated with "the sound judgment of the court, to be exercised according to the rules of law." [Citation.]' [Citation.] Thus,

11.

'[t]he courts have never ascribed to judicial discretion a potential without restraint.' [Citation.] 'Discretion is compatible only with decisions "controlled by sound principles of law, … free from partiality, not swayed by sympathy or warped by prejudice .…" [Citation.]' …

"On appeal, two additional precepts operate: 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*Alvarez, supra,* 14 Cal.4th at pp. 977-978.)

The Supreme Court has concluded that in this situation relevant factors for trial courts when exercising its discretion include "'the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial.' [Citations.] When appropriate, judges should also consider the general objectives of sentencing such as those set forth in California Rules of Court, rule 410."[3] (*Alvarez, supra,* 14 Cal.4th at p. 978.)

_____

[3]California Rules of Court, former rule 410 has been renumbered and is now 4.410 and titled "General objectives of sentencing." Rule 4.410 states:

"(a) General objectives of sentencing include:

"(1) Protecting society;

"(2) Punishing the defendant;

"(3) Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses;

"(4) Deterring others from criminal conduct by demonstrating its consequences;

"(5) Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration;

"(6) Securing restitution for the victims of crime; and

Standen asserts the trial court abused its discretion because he testified the billy club was a memento from his grandfather; he did not know it was illegal; he never intended to use it as a weapon; and it was in his bedroom when it was discovered by the police. According to Standen, his possession of the billy club was harmless. He also argues the factors found in California Rules of Court, rule 4.410 do not support the trial court's denial of his motion. We disagree.

The two factors in California Rules of Court, rule 4.410 we find relevant are the need to protect society and encouraging Standen to obey the law. As courts have pointed out for over 70 years, one possesses a billy club generally for unlawful purposes. While Standen professed no knowledge of the illegality of the billy club, and professed no intent to use it to harm others, the trial court was not required to accept these representations. After all, Standen was seeking to minimize his criminal culpability, thus creating doubt as to his credibility. Moreover, the trial court could very well have concluded that Standen possessed the billy club to defend his marijuana crop. The evidence at trial indicated that other defensive measures to protect the crop were taken, such as a four-foot by eight-foot piece of plywood with nails sticking out of it that was lying on the ground and a two-inch by 12-inch board with nails sticking out of it that was placed on the fence. It is easy to infer from these defensive efforts that the billy club was simply another weapon used to defend the marijuana crop.

The other relevant factor was the need to encourage Standen to obey the law. The record, including the probation report that the trial court possessed at the time Standen

"(7) Achieving uniformity in sentencing.

"(b) Because in some instances these objectives may suggest inconsistent dispositions, the sentencing judge must consider which objectives are of primary importance in the particular case. The sentencing judge should be guided by statutory statements of policy, the criteria in these rules, and the facts and circumstances of the case."

made his motion, indicated Standen had a prior embezzlement conviction for which he was on probation at the time of this offense. The trial court also found Standen in violation of his probation as a result of this conviction. Taking these circumstances into consideration, the trial court reasonably could have inferred that Standen needed additional encouragement to obey the law.

The trial court's ruling was neither arbitrary nor capricious. Accordingly, the trial court did not abuse its discretion when it denied Standen's motion.

## DISPOSITION

The judgment is affirmed.

_____
CORNELL, Acting P.J.


WE CONCUR:


_____
GOMES, J.


_____
HOFF, J.*

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14.